[No. 82842-3. En Banc.]
Argued October 28, 2010.     Decided August 18, 2011.

KEVIN DOLAN, *and a Class of Similarly Situated Individuals, Respondents*, v. KING COUNTY, *Petitioner.*

*Michael Reiss, Roger A. Leishman, Amy H. Pannoni,* and *Gillian Murphy* (of *Davis Wright Tremaine LLP*) and *Philip A. Talmadge* and *Emmelyn Hart* (of *Talmadge/Fitzpatrick*), for petitioner.

*David F. Stobaugh, Stephen K. Strong, Lynn S. Prunhuber,* and *Stephen K. Festor* (of *Bendich Stobaugh & Strong PC*), and *William R. Hickman* (of *Reed McClure*), for respondents.

*James K. Pharris, Deputy Solicitor General*, on behalf of the Office of the Attorney General, amicus curiae.

¶1 CHAMBERS, J. — In *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963), the United States Supreme Court guaranteed to indigents the right of legal representation at public expense. King County, like other local governments in this state, sought ways to provide the required defense services to indigent criminal defendants. After investigating several different models, the county settled on a unique system using nonprofit corporations to provide services funded through and monitored by the county's Office of the Public Defender (OPD) (formerly the Office of Public Defense). It is, in many ways, a model system providing quality representation to the poor. Over time, the county has taken steps to improve and make these nonprofit organizations more accountable to the county. In so doing, it has asserted more control over the groups that provide defender services. Kevin Dolan contends that the defender organizations are now no different from any other agency of King County and that the employees of these defender organizations are now, and for some time have been, entitled to be enrolled in the government's Public Employees Retirement System (PERS). After a trial on the record, the trial court agreed with the class. Applying the pertinent statutes and common law principles, we hold that the employees of the defender entities are "employees" under RCW 41.40.010(12) and are entitled to be enrolled in the PERS. We affirm the trial court and remand to that court for further proceedings regarding remedies.

## FACTS AND PROCEDURAL HISTORY

¶2  Resolution of the issues presented requires a detailed review of the relationship between King County and its public defender organizations. In 1969, the first King County nonprofit public defender entity, The Defender Association (TDA), was created as a joint venture with the city of Seattle and the federal Model Cities Program. The independent nature of TDA was a primary reason for the county's adoption of this model. The county thought public defense "must be divorced as far as possible from the control of the entity which is placing the recipients' liberty in jeopardy, that is, from King County." Clerk's Papers (CP) at 1314 (Report of King County Council Operations and Judiciary Committee).

¶3  Over the years, the system evolved into its present form, with four public defense organizations providing almost all indigent defense services for the county. The Associated Counsel for the Accused (ACA) was created in 1973. The Society of Counsel for the Representation of Accused Persons (SCRAP) was formed at the request of the county in 1976. The Northwest Defenders Association (NDA) was established in 1987 in response to the county's desire for an organization with a larger number of minority management and board members. Another public defense organization, the Eastside Defender Association, was formed in 1978 and then discontinued in 1984.

¶4  A few years after its formation, TDA had several King County representatives on its board of directors. At the time, local government participation seemed "necessary to assure the visibility and longevity of the program." CP at 1336 (Letter from King County Executive). However, by 1979, all the nonprofit public defender groups had independent boards and substantial autonomy over operations. *See id.* at 1336-37; *see also* CP at 1340-42 (1979 TDA Contract). Each defender organization negotiated a contract with the

county for the services the organization would perform for a fee. The county managed its public defense program through the OPD, a division of King County's Department of Community and Human Services and ultimately part of the county's executive branch. The OPD was and is responsible for screening eligible defendants, assigning cases, negotiating and administering the contracts with the four defender groups, and managing the funds provided by the county. The OPD and the public defender organizations negotiate new contracts annually.

¶5 Over the course of several decades the county began to exert more and more control over the defender organizations. This evolution of greater county control was in response to several events and the county's desire for efficient budgeting, high quality of defender services, and parity in pay among deputy prosecutors and public defenders doing similar work. An event in 1984 seems critical to the evolution of the relationship between the county and defender organizations. An audit of the Eastside Defender Association revealed that the director was engaged in some self-dealing, including renting space from his daughters and paying his wife for financial advice, and that the organization's board consisted of himself, his wife, and his mechanic.[1] These revelations caused the county to cancel its contract with Eastside Defender Association, which immediately then ceased to exist. It also caused the county to carefully scrutinize expenditures and to require a reorganization of its relationship with all the defender organizations.

¶6 The defender organizations were required to provide the county with a detailed budget of the costs of providing anticipated defender services, and those estimated costs became part of the contract amount between the county and the organization. CP at 1270-71 (Boruchowitz Decl.). By

---

[1] Despite the irregularities, there did not appear to be any violations of the law or the contract between the Eastside Defender Association and the county. CP at 1345.

1990, the county went to a cost pass-through budget system, also referred to as a zero-based budget system.[2] *Id.* at 1273, 1275. Expenses of each defender organization became a line item in the county's budget. CP at 628-29 (Chapman Decl.). The contract budgets were based on the defender organizations' actual costs and the county's projection of the case load, which in turn determined the number of defense lawyers needed and the ratios of staff to lawyers. *Id.* at 629, 634. Later the defender organizations were advised by the county that equipment purchased for $1,000 or more belonged to the county. CP at 1279 (Boruchowitz Decl.). Through this process, the county had effective right of control and approval over all leases and other defender organizations' expenditures. *E.g.*, CP at 2891-92 (Daly Dep.).

¶7 Also during the 1980s, the defender organizations argued that defender lawyers should receive the same pay as prosecutors because they did similar work and, unlike prosecutors, defenders were constitutionally mandated. In 1989, the county commissioned the Kenny Group to study prosecutors and public defenders, classify their positions, and address the issue of pay parity for public defenders. The Kenny Group created and classified five levels of deputy prosecuting attorneys, three levels of senior deputy prosecuting attorneys, four levels of public defense attorneys, and three levels of senior public defense attorneys. CP at 627 (Chapman Decl.). The Kenny classifications became known as the Kenny Scale. *Id.* at 626. The county provided by ordinance that salary parity would be phased in over two years.[3] The record before us is less than crystal clear on parity. It appears that while the county made an effort toward parity, the defender organizations never felt parity was achieved. According to the defender organizations, the county failed to provide funding for senior defender posi-

---

[2] The county used the same budget system for its own agencies and departments. CP at 628 (Chapman Decl.).

[3] King County Ordinance 9221 (Nov. 22, 1989) (CP at 715-20).

tions and therefore the organizations had to classify defenders in lower classifications than prosecutors with similar experience.[4] CP at 1282 (Boruchowitz Decl.). The county also took the position that parity applied only to base pay and not benefits. *Id.* at 1277. The county did provide funding for mandatory employer taxes such as the Federal Insurance Contribution Act tax and unemployment insurance. *Id.* at 1278. The county also provided sufficient funding for medical benefits; however, the county did not provide sufficient funding for the defender organizations to make meaningful retirement contributions. CP at 662 (Chapman Decl.). Apparently the defender organizations had goals of providing retirement benefits of up to four percent but funding permitted a contribution of only one percent, two percent, or nothing depending on the budget. *Id.*; CP at 1278 (Boruchowitz Decl.).

¶8 In 2002, NDA sought to rent some office space in downtown Seattle that carried a higher rent than customary for defender groups. In August 2002, the county audited NDA and found what it considered several irregularities. NDA, perhaps believing it could legitimately do so as an independent organization contracting with the county, was branching out into civil and for-profit work and rented office space for these purposes. The county perceived NDA's actions as using some of the county's funding for improper purposes. Further, the county believed NDA did not have a properly constituted board of directors and had leased a space unapproved by the county. The county's Department of Community and Human Services brought a receivership action against NDA. On September 27, 2002, the trial court granted the county's motion to have a receiver appointed for NDA. The receiver was given "exclusive possession and control over all assets [of NDA], with the power and

---

[4] The defender organizations sought funding for 17 new "senior" positions based on the Kenny Scale classifications, but the county rejected the request. CP at 1282 (Boruchowitz Decl.).

authority to preserve, protect, and liquidate them for the benefit of plaintiff [King County]."[5] CP at 2335.

¶9 In the process of reorganizing NDA, the county required changes in the composition of the board of directors, bylaws, corporate articles, employee policies, financial practices, and contract with the county for all of its public defender organizations. CP at 3120 (Robinson Dep. at 27-29); CP at 2236-37 (Farley Decl.). All defender groups were made subject to a new contract that gave King County the authority to terminate the contract without cause upon 45-days notice, to review client files, to unilaterally determine whether funds were properly expended, and which also restricted the organizations' ability to turn down individual cases.[6,7] *Id.* at 2238; CP at 1279 (Boruchowitz Decl.); CP at 646 (Chapman Decl.); CP at 2393-2413, 2394, 2395, 2397, 2411 (2003 NDA Contract).

¶10 The record reflects that many defender board members had serious misgivings about the new order of things and were very concerned about the new limits on the defender organizations' ability to limit assignments and thereby run the risk of ethical dilemmas. One board member said the county was transforming a supposedly independent nonprofit into a " 'vassal agency.' " CP at 4331 (TDA Board Minutes). But because the county was the source of the vast majority of revenue, to refuse to agree to

---

[5] The order was amended on November 15, 2002, upon request for clarification by the receiver, to read "for the benefit of Northwest Defenders Association." CP at 2341.

[6] In subsequent years, the contract language was softened, including the termination clause. CP at 5690-5710 (2007 Contract). Rather than at will by the county, contracts after 2004 could be terminated "for convenience by either party" upon 60-days notice. *Id.* at 5695.

[7] As part of its budgeting matrix, the county also required each defender organization to maintain a reserve fund that would provide sufficient funds to complete services to clients assigned to the organization in case of contract termination. CP at 643-44 (Chapman Decl.).

the contract meant that the organizations, like the Eastside Defender Association, would cease to exist.[8]

¶11 According to evidence in the record, these board members agreed to the new arrangement primarily out of concern for what would happen to the organizations' employees and because of concern for the organizations' client base. *See* CP at 646-47 (Chapman Decl.); CP at 1281 (Boruchowitz Decl.). Ultimately all defender groups signed the contract despite serious misgivings.

¶12 In 2005, the county developed a new and complex "public defense payment model." CP at 648-52 (Chapman Decl.). The budgets of all of the defender organizations were blended together for presentation to the county, and the county calculated an average percentage to be allocated to each organization on the basis of projected caseloads, the Kenny Scale, attorney-to-staff ratios, and past data on the overhead expenses and administrative costs for each organization. The new model effectively treats the four defender organizations as one for budgeting purposes. CP at 652 (Chapman Decl.).

¶13 There is no dispute the defender organizations have autonomy to make day-to-day decisions on the representation of indigent clients. Because, of course, the county is bringing the charges against the defendants represented by the defender organizations, the county has made an effort

---

[8] In 2004, the city of Seattle ended its 20-year arrangement with King County to provide defense services through its defender organizations. It contracted directly with ACA, and ACA now receives approximately $3 million a year from the city, about one quarter of the total operating budget. However, ACA could not continue its public defense operations without the $9 to $10 million provided by county funding. CP at 660 (Chapman Decl.). TDA receives approximately 90 percent of its funding from King County, with some additional grants from the county and the State for racial disparity and sexually violent predator programs, and other funding sources for public defense related work, such as a contract with Seattle Municipal Courts, making up the balance. CP at 1285 (Boruchowitz Decl.). TDA could not continue in its present form without county funding. *Id.* SCRAP receives 98 percent of its annual $10 million budget from King County, with the remainder made up of two small grants from the county and the State for public defense related projects. CP at 1733 (Daly Decl.). The county was the sole source of funds for NDA in 2003. CP at 2238 (Farley Decl.). It appears that was still the case until at least 2008. *See id.* at 2243.

not to interfere with attorney/client relationships or trial strategies.

¶14 On January 24, 2006, Dolan filed a class action in the Pierce County Superior Court on behalf of the employees of the four King County defender organizations, seeking enrollment in PERS. The trial court certified the class of "[a]ll W-2 [(tax wage form)] employees of the King County public defender agencies and any former or predecessor King County public defender agencies who work or have worked for one of the King County public defender agencies within three years of filing this lawsuit." CP at 7087 (Findings of Fact and Conclusions of Law at 1). The parties agreed to separate the trial into two distinct phases: liability first, then remedies. The parties further agreed that, if the court denied summary judgment, the judge should decide the issues on the basis of the written record alone. The trial court denied both parties' motions for summary judgment and commenced a bench trial on the written record to determine liability.

¶15 The class presented evidence that the county treated the defender organizations exactly like the county treated any other agency of the county. For example, defender groups participate in the county budgeting process exactly like any other agency. *See* CP at 2684 (Cruz Decl.); CP at 2646-47 (Thoenig Decl.). Each item of expense such as rent, payroll, lease payments on equipment, and other costs becomes a separate line item in the budget.[9] It is the budget process that determines the amount the defender group receives. In the event of a budget crisis where there is a countywide reduction in budget, the defender groups must reduce their budgets in the same percentage as other agencies.[10] CP at 628 (Chapman Decl.). Once the budget is

---

[9] It is not clear whether this remains the case after the new 2005 budget process came into effect.

[10] After oral argument, Dolan submitted supplemental evidence regarding furloughs. The county responded with a motion to strike the supplemental evidence and impose sanctions. We grant the motion to strike but decline to

approved, the total budget amount becomes the contract amount. *Id.* at 625. According to evidence presented by the class, there is no real negotiation of the contract, and signing the contract is a formality, which sometimes occurs after the contract period has expired. *Id.* at 625, 631, 638-39. The county has maintained that the defender organizations may not retain for their own purposes any profits or any funds that may be left over from the budget. CP at 2233 (Farley Decl.); *see also* CP at 1237-38 (Daly Decl.). Nor are they held liable for any budget shortages. *See* CP at 7176 (Resp'ts' WAC Factor Chart). The class also points out that, like the defender organizations, county agencies have authority to exercise discretion in day-to-day activities, including the hiring and firing of employees. CP at 268-82 (Cruz Decl.).

¶16 The county points out that the defender organizations have historically been independent, with their own articles and bylaws, control over day-to-day operations, and independent boards of directors. Moreover, the organizations file Form 990 with the Internal Revenue Service (IRS), which confirms their status as private nonprofits. *See, e.g.,* CP at 6146 (TDA tax exemption form). The county also asserts that the organizations have complete control over their funds, stating that the budgetary formula "generated a sum of money that *each corporation could spend any way it wanted.*"[11] Br. of Pet'r at 43.

¶17 The county has made an admirable effort to establish parity among the lawyers who work for the prosecutor's office and the defender organizations. All receive the same cost-of-living increases. All employees of the defender organizations must comply with the county's " 'Employee Code of Ethics.' " CP at 1747 (Daly Decl.).

---

impose sanctions. In addition, King County submitted an answer to an amicus brief filed by the Washington State attorney general, and Dolan responded with an objection, which we are treating as a motion to strike. The motion is denied.

[11] In fact, the portion of the record cited for the proposition states that the organizations can "allocate the total contractual sum *in a variety of ways.*" CP at 5465 (emphasis added).

¶18 The trial court found the class was eligible for PERS enrollment on the separate but overlapping ground that the defender organizations were arms and agencies of the county, and the county was an employer of the organizations' employees. The court granted an injunction ordering enrollment but left the enrollment date open pending further motions by the parties. The trial court did not reach the issue of remedies. The county moved for certification for immediate discretionary review under RAP 2.3(b)(4) and a stay of proceedings pending appeal. The trial court granted both motions, and we accepted review. Thus, the question before this court is the eligibility of the class for enrollment in PERS. Since we have never interpreted or applied the PERS statutes and regulations at issue here, it is a question of first impression.

## ANALYSIS

### 1. STANDARD OF REVIEW

¶19 Where the record at trial consists entirely of written documents and the trial court therefore was not required to " 'assess the credibility or competency of witnesses, and to weigh the evidence, nor reconcile conflicting evidence,' " the appellate court reviews de novo. *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 252, 884 P.2d 592 (1994) (quoting *Smith v. Skagit County*, 75 Wn.2d 715, 718, 453 P.2d 832 (1969)). However, where competing documentary evidence must be weighed and issues of credibility resolved, the substantial evidence standard is appropriate. *In re Marriage of Rideout*, 150 Wn.2d 337, 351, 77 P.3d 1174 (2003). The county argues that de novo review is proper here.

¶20 Dolan responds that the substantial evidence standard is more appropriate in this case. Dolan points out that the trial court was required to weigh over 6,000 pages of testimony and exhibits, resolve conflicts, and issue formal findings of fact as required by CR 52(a)(1). In essence,

Dolan argues that the complexity and size of the record, and the careful weighing of that record for over three months by the trial court, make the substantial evidence standard preferable to de novo review despite the lack of any specific issues of credibility.

¶21 Appellate courts give deference to trial courts on a sliding scale based on how much assessment of credibility is required; the less the outcome depends on credibility, the less deference is given to the trial court. Washington has thus applied a de novo standard in the context of a purely written record where the trial court made no determination of witness credibility. *See Smith*, 75 Wn.2d at 719. However, substantial evidence is more appropriate, even if the credibility of witnesses is not specifically at issue, in cases such as this where the trial court reviewed an enormous amount of documentary evidence, weighed that evidence, resolved inevitable evidentiary conflicts and discrepancies, and issued statutorily mandated written findings. *See Rideout*, 150 Wn.2d at 352; *Anderson v. City of Bessemer City*, 470 U.S. 564, 574-75, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985) (deference rationale not limited to credibility determinations but also grounded in fact-finding expertise and conservation of judicial resources). We apply the substantial evidence standard in this case because of the size and complexity of the record and the need to resolve conflicting assertions. Having examined the record carefully, however, we would reach the same result if we applied a de novo standard of review.

## 2. PERS ELIGIBILITY

### a. Arms and Agencies

¶22 A PERS eligible employee must work for a PERS employer. *See* RCW 41.40.010(12) (former RCW 41.40-.010(22) (1997)); RCW 41.40.010(13) (former RCW 41.40-.010(4) (1993)). A PERS "employer" is defined in relevant part as "any political subdivision of the state." RCW 41.40-

.010(13)(a),(b). Counties are political subdivisions of the State and therefore PERS employers. *See Fitzpatrick v. Okanogan County*, 169 Wn.2d 598, 628, 238 P.3d 1129 (2010) (quoting *Olson v. King County*, 71 Wn.2d 279, 284, 428 P.2d 562 (1967)). Thus, if we conclude, as Dolan contends, that the defender organizations are in fact arms or agencies of the county, then the defender organizations' employees are "employees" as defined by RCW 41.40.010(12).

¶23 Dolan asserts that under common law standards the county has such a right of control over the organizations that the organizations are arms and agencies of the county, and therefore employees of the organizations are PERS eligible. Dolan argues the county has general control over the organizations through its budget process and the fact that the organizations would not exist without county funding.[12] Dolan asserts the county has used that control to "rewrite articles of incorporation, bylaws, and contracts, renegotiate leases, and change employee policies and procedures." Resp'ts' Br. at 23-24. Dolan points out the defense organizations are thoroughly integrated into the county budgeting process and administrative procedures to the extent that the only difference between the King County nonprofit entities and the Pierce County Department of Assigned Counsel, an official county department, is formal, not functional. *Id.* at 20-21, 30 (citing CP at 662-62 (Chapman Decl.); CP at 2648 (Thoenig Decl.)). Dolan also contends the many limitations imposed on the defender groups are further evidence of control, including prohibitions

---

[12] For example, as mentioned above, the contract price is not a negotiated term but is determined the previous year by the county's budget process. CP at 625, 631, 638-39 (Chapman Decl.). The contracts appear to be considered mere details; the constitutionally mandated services of the defender organizations are often performed without any contract for the corresponding period having been signed. *Id.*; CP at 1734 (Daly Decl.). The contract is presented in a "take it or leave it" form, where "leaving it" means the organizations would cease to exist. In essence, Dolan argues that the county creates its own public defense budget each year, then uses the organizations as a "pass-through of County funds to pay salaries of its lawyers and staff." CP at 2243 (Farley Decl.). According to the record, the budget "is the main way that the County Council exercises its authority over County operations." CP at 2684 (Cruz Decl.).

onother sources of revenue, affiliation with other entities, leasing of office space, competition with other defender organizations for market share, and spending budgeted funds from the county. Resp'ts' Br. at 24-25, 34-36 (citing, *e.g.*, CP at 660-61 (Chapman Decl.); CP at 1738, 1749 (Daly Decl.); CP at 2237, 2239 (Farley Decl.)).

¶24 King County calls Dolan's claim a "de facto agency" argument and contends de facto agencies are disfavored under Washington law. The county maintains that, even if there is such a thing as a de facto agency in Washington, the defender organizations are independent both historically and in their day-to-day operations, as their private, non-profit status in contracts, corporate documents, and tax forms indicates. Br. of Pet'r at 54-55 (citing, *e.g.*, CP at 6183-6299 (Organizations' Articles of Incorporation); CP at 5903-6168 (Organizations' IRS Filings)). The county asserts contrary to Dolan's claims that a defender organization could spend the lump sum budgeted to it "any way it wanted." Pet'r's Br. at 43 (emphasis removed). It also disputes that the organizations are required to have an exclusive relationship with the county. *Id.* at 17 n.3 (citing, *e.g.*, CP at 2843-44 (Chapman Dep. at 113-14)). As discussed above, the county argues that it is undisputed the defender organizations have autonomy to hire and fire and promote employees. The defenders respond that their limited authority to decide how to spend funds and to hire and fire is no different from the authority enjoyed by other county agencies.

¶25 Dolan relies largely on two sources of authority for the proposition that the control the county has over the defender organizations can render them arms and agencies of the county. In 1956, the Washington State attorney general issued an opinion that stated that the Associated Students of the University of Washington (ASUW), a non-profit corporation that is the primary student organization at the university, was an "arm and agency" of the university—and thus the State—because the university had the right of final approval of all actions taken by the ASUW.

1956 Op. Att'y Gen. No. 267, at 2-3. Thus, employees of the ASUW were entitled to be included as members of the state retirement system. *Id.* at 6.

¶26 Similarly, the Oregon Court of Appeals held a private nonprofit formed by the city of Portland to manage its energy policy was an instrumentality of the city for the purposes of Oregon's PERS. *State ex rel. Pub. Emps.' Ret. Bd. v. City of Portland*, 69 Or. App. 117, 684 P.2d 609 (1984). Specifically, the court found that control over day-to-day operations was not necessary for its ruling because under the articles of incorporation the city council could dissolve the corporation at any time, and the directors served at the council's pleasure. *Id.* at 121-22. The fact that the city never exercised that authority did not matter—just having it was enough to make the nonprofit corporation an instrumentality of Portland. *Id.* at 122.

¶27 These sources support Dolan's position that, analytically, the issue is the nature of the relationship between the county and the defender organizations. There is a substantial body of law distinguishing between the employment relationship and the independent contractor relationship. The bedrock principle upon which relationships are analyzed under the common law is the right of control. *Hollingbery v. Dunn*, 68 Wn.2d 75, 80-81, 411 P.2d 431 (1966). The focus is on substance and not on corporate forms, titles, labels, or paperwork. *See* WAC 415-02--110(2)(c) (noting that for purposes of PERS eligibility, "whether the parties regard the worker as being an independent contractor is not controlling" and "disclaimers . . . are not binding on the department for the purpose of determining employer-employee status").

¶28 Dolan's argument is further supported by the statutory definition of "employee." In 1997, the legislature amended the PERS statutes. LAWS OF 1997, ch. 254. The definition of "employee" in former RCW 41.40.010(22), *recodified as* RCW 41.40.010(12), was amended with instructions to the

Department of Retirement Systems (DRS) to "adopt rules and interpret [the] subsection consistent with common law." LAWS OF 1997, ch. 254, § 10(22). The legislature made clear that the amendments were meant to be "consistent with long-standing common law of the state of Washington and long-standing department of retirement systems' interpretations of the appropriate standard to be used in determining employee status." *Id.* § 1(2). Therefore, if the "arm and agency" theory asserted by Dolan is part of Washington common law or relied on by DRS, the county's control over the organizations may be determinative of whether the organizations' employees are "employees" as defined by RCW 41.40.010(12).

¶29 The attorney general opinion relied on by Dolan is both a part of Washington common law and used by DRS in determining employee status. In that opinion, as described above, the attorney general found that ASUW was an "arm and agency" of the State because the university had the power to control its actions, and thus its employees were PERS eligible. 1956 Op. Att'y Gen. No. 267, at 2-3. First, this court, albeit in a different context, adopted and applied the reasoning of the attorney general opinion over 30 years ago, and explained that, although the university had never exercised its power, failure to exercise it did not mean the power did not exist. *Good v. Associated Students of Univ. of Wash.*, 86 Wn.2d 94, 97-99, 542 P.2d 762 (1975). The court therefore rejected the contention of three students that ASUW was an independent organization and not an "arm and agency" of the university. *Id.* at 99.

¶30 Second, the same attorney general opinion has been relied on by DRS in the context of PERS eligibility. According to the record, following a newspaper expose claiming that the Washington State University (WSU) bookstore was operating for profit, "it was questioned whether the bookstore's employees should be covered under [PERS]." CP at 6608 (DRS Mem.). Further investigation revealed that the "State Auditor . . . did not consider this entity either as part

of WSU or as another state agency or political subdivision."
*Id.* The bookstore's payroll officer likewise asserted that
"the bookstore is considered a separate operation and not
part of the University." *Id.* The DRS audit team requested
review from the DRS Legal Affairs Unit. *Id.* at 6610. In
answering the question of whether the bookstore was a
valid PERS employer, and thus whether its employees were
validly enrolled in PERS, the DRS response stated that
under the 1956 attorney general opinion it did not matter
whether the bookstore was considered a separate PERS
employer or simply part of the university. CP at 6606 (DRS
Letter Ruling, Dec. 31, 1990). The letter explained that "the
Bookstore is an arm and agency of WSU (AGO [(Attorney
General Opinion)] No. 267, at 55-57), as the entire capital
stock of the Bookstore is under the control of the WSU
Board of Regents." *Id.* Thus there was no question that the
employees were PERS eligible; the only question was the
administrative one of whether the bookstore should have
reported as a separate entity or under the umbrella of WSU.
*Id.* at 6607. The letter did not to answer that question. *Id.*

¶31 According to the attorney general opinion adopted
by this court and DRS, a PERS employer may have such
control over an entity that it is an arm and agency of the
PERS employer, and its employees therefore eligible for
PERS as "employees" under RCW 41.40.010(12).[13] We thus

---

[13] The county is correct that both this court's opinion in *Good* and the DRS
interpretation addressed above are distinguishable because the right to control
was explicit in the corporate articles or bylaws of the organizations at issue, but
that fact should not end the inquiry. As in *Hollingbery* and the common law, we
must look beyond formalities to the actual nature of the relationship. *Hollingbery*,
68 Wn.2d at 80 ("Whether in a given situation, one is an employee or an
independent contractor depends to a large degree upon the facts and circum-
stances of the transaction and the context in which they must be considered."). The
county makes two arguments disputing this proposition. First, the county asserts
that the definition of a "public employer" for PERS purposes does not include
private nonprofit corporations. *See* RCW 41.40.010(13)(a), (b) (former RCW 41.40-
.010(4)(a), (b)). The county argues that because the statute defines a PERS
"employer" in relevant part as "every branch, department, agency, commission,
board, and office of the state," the defender organizations cannot be PERS
employers. *See id.* It asserts that because the county did not enact ordinances
designating the organizations as official county departments, they cannot be

can consider whether, under the common law as incorporated into former RCW 41.40.010(22), the employees of the defender organizations are county employees.

### b. County Control over Defender Organizations

¶32 We would like to emphasize that no single factor controls. *Hollingbery*, 68 Wn.2d at 81. An independent contractor, whether for profit or nonprofit, does not lose its independence simply because it is providing a public service at the request of the government. Further, government can and should exact high standards of performance from its independent contractors. Prudent financial controls and careful oversight of contract compliance does not render a contractor an agency of the government.[14] " 'The retention of the right to inspect and supervise to [e]nsure the proper completion of the contract does not vitiate the independent contractor relationship.' " *Hennig v. Crosby Grp., Inc.*, 116 Wn.2d 131, 134, 802 P.2d 790 (1991) (quoting *Epperly v. City of Seattle*, 65 Wn.2d 777, 785, 399 P.2d 591 (1965)). However, government cannot create an agency to perform a government function, incorporate it into its yearly budget process and control it like any other government agency, and claim it is an independent contractor simply because of the form of name or title.

---

PERS employers under the statute. The county's argument is high formalism and entirely overlooks the fact that the "arms and agencies" determination rests on the amount of control the county has, not the method by which the county creates its departments. We reject such a limited view of what constitutes a government agency. Second, the county argues that "de facto" agencies are disfavored under Washington law. Br. of Pet'r at 55. It bases this argument on "the well-understood concept that while there can be a de facto officer, there can be no officer de facto without an office de jure." *Id.* The county also cites some case law that has little discernable relevance to the case at hand. *See Higgins v. Salewsky*, 17 Wn. App. 207, 562 P.2d 655 (1977). This argument is at best obscure and at worst nonsensical.

[14] The dissent incorrectly asserts that our decision rests "on contractual provisions permitting the County to supervise the end-level quality of the product it bargained for." Dissent at 329. Despite the dissent's characterization, the problem does not lie with any particular contractual provisions. The defender organizations can no longer be considered independent contractors not because the county has inserted supervisory provisions in the contract, but because the county has in actual practice expanded its control far beyond the supervision of end-level quality.

¶33 The county argues that "[t]he proper focus . . . is the County's control over the manner in which *the corporations' attorneys and staff* perform their work." Reply Br. of Pet'r at 4. The county argues that the defenders are free to defend clients without interference and may hire and fire without interference, and that the county does not interfere with the defender groups' day-to-day activities. Thus the county reasons that it merely seeks a result as a principle and does not control the manner in which the independent contractors perform. *Id.* at 21 (citing *Hollingbery*, 68 Wn.2d at 80-81; RESTATEMENT (SECOND) OF AGENCY § 220 (1958)). Under its reasoning, the county could turn its sheriff's department into a nonprofit corporation and because the sheriff generally has authority to hire and fire and carry out police work, the sheriff's department would become an independent contractor. The county is wrong.[15]

¶34 A review of the record reveals that the county, perhaps for very legitimate reasons, has gradually extended

---

[15] The dissent argues, like the county, that lack of control over the day-to-day job performance of the organizations' employees precludes a finding that the employees are entitled to PERS benefits. The dissent is correct that control over the details of the work is generally the fundamental inquiry in determining employment relationships. However, that test is unhelpful in this case for several reasons. First, "a public defender is not amenable to administrative direction in the same sense as other employees of the State." *Polk County v. Dodson*, 454 U.S. 312, 321, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981). Because "a public defender works under canons of professional responsibility that mandate his exercise of independent judgment on behalf of the client," and "it is the constitutional obligation of the State to respect the professional independence of the public defenders whom it engages," insistence on the traditional test of control over the details of the employee's day-to-day job performance is unworkable in this context. *Id.* at 321-22. Second, the DRS itself has, for similar reasons, determined that an employee relationship existed under similar circumstances despite lack of control over details. Resp'ts' Br. at 40. The DRS held that a judge who contracted with the city of Kent was an employee for PERS purposes despite an explicit disclaimer in the contract, and despite the fact that the city had no control over the details of his work. CP at 2183-96 (*In re Petition of Robert McSeveney* (Sept. 16, 2003)). Many of the factors applied to the judge by the DRS are strikingly similar to the factors as applied to the agency employees. *Compare* CP at 2193-94 (DRS WAC Factor Chart), *with* CP at 7171-81 (Respondents' WAC Factor Chart). Finally, the dissent's limitation of the common law control test to individual employees entirely ignores the fact that an organization may be an arm and agency of the State. That determination, as we have described, turns on the nature of the relationship between organizations, not individual employees within the organizations.

its right of control over the defender organizations until they indeed have become vassal agencies of the county. The following examples of the county's right of control over the defender organizations support our conclusion that, under common law principles, the defender organizations are in fact agencies of the county. The defender organizations were created specifically to carry out a constitutionally mandated function of the county. Generally, independent contractors determine their own formal structure, such as the composition of their boards, articles, and bylaws; but the county has imposed stringent control over the defender organizations' formal structure. Generally, independent contractors may have many clients, but the defender organizations are true captives of the county in the sense that they cannot have other clients without the county's consent and the county provides virtually all of the organizations' funding.[16] Independent contractors can usually bid for or negotiate contracts; the contracts of the defender organizations are merely a pass-through of the county's budgeting process.[17] Independent contractors may generally lease space or acquire property without approval; the defender

---

[16] The county counters that like an independent contractor, some of the organizations can and do contract separately with municipalities other than King County. Br. of Pet'r at 17 n.3 (citing, *e.g.*, CP at 2843-44 (Chapman Dep. at 113-14)). Presumably the county means the city of Seattle, since that is the only other municipality with which the record shows the organizations contracted. *E.g.*, *id.* at 659-60. Other than cities and other government entities, the county strictly limits with whom the organizations may contract. The county code states that the county "may enter into agreements with nonprofit corporations formed for the specific purpose of rendering legal services [on] behalf of indigents to provide legal services to persons eligible for representation through the public defense program." KING COUNTY CODE 2.60.040. The county has interpreted this to mean the organizations, unlike a true independent contractor, may never "engage[ ] in providing [ ] any other form of legal representation -- whether for profit or pro bono." CP at 2232 (Farley Decl.).

[17] The dissent chooses to ignore this fact completely when it states that "the corporations could negotiate with the County on their own accord" to receive pension funding. Dissent at 328. The lack of any real negotiating power on the part of the public defender organizations is evidenced by the numerous unilateral decisions made by the county over the years. In the context of the facts of this case, it is remarkable to suggest that the organizations could have negotiated pensions if they wanted them.

organizations may not lease or acquire property without the county's approval and the county has asserted that property owned by the organizations belongs to the county.[18]

■ ¶35 Further, independent contractors would generally realize profits or losses and nonprofit entities would be entitled to set aside money for future growth and expansion. Independent contractors generally do not have customers establish a pay scale for their employees or require the independent contractors to give their employees the same cost-of-living increases that the customer's employees receive.[19] While no single factor or combination of factors is controlling, we hold that the county has exerted such a right of control over the defender organizations as to make them agencies of the county.[20] We hold that under Washington common law as adopted in RCW 41.40.010(12), the employees of the defender organizations are employees of the county for purposes of PERS.

### 3. KING COUNTY'S AFFIRMATIVE DEFENSES

#### a. Collateral Estoppel

■ ■ ¶36 The county argues collateral estoppel bars Dolan's claim on the basis of an unpublished summary judgment order in *White v. Northwest Defenders Ass'n* that found an NDA employee was not an employee of the King County OPD for the purposes of a wrongful termination

---

[18] The county appears to have changed its rent approval requirements upon being made aware of the employees' claims in this lawsuit. CP at 2834-35 (Chapman Dep.).

[19] Also, unlike in a contract with a truly independent contractor, as noted above, the county inserted a "termination at will" clause in 2003, which effectively gave the county the power to terminate the existence of any or all of the organizations at its slightest displeasure. This clause was replaced by a "termination for convenience" clause in the following years, which is not easily distinguished in actual effect.

[20] The dissent suggests our holding "places numerous government contracts with independent contractors at risk of being misconstrued as creating employer-employee relationships." Dissent at 329 n.27. The dissent cites no examples of contractors whose circumstances even remotely resemble those of the public defenders here.

claim. Order Granting Summ. J., *White v. NDA*, No. 94-2--09128-0 (King County Super. Ct., Wash. Dec. 2, 1994). Collateral estoppel requires, at a minimum, that the identical issue was decided in the prior action. *Hanson v. City of Snohomish*, 121 Wn.2d 552, 561, 852 P.2d 295 (1993). In *White*, the issue was whether the OPD was vicariously liable for employment discrimination, and the court issued a three-page summary judgment order determining that it was not. Here the issue is whether Dolan and the class he represents are PERS eligible. The cases are not comparable. Moreover, collateral estoppel requires identical parties or privity with the original parties. *Id.* Ted White was fired from NDA in 1994, and the class includes persons who have worked for one of the four defender organizations between 2003 and 2009. Thus he is not, as the county asserts, a "member of the class," and there is no privity. Br. of Pet'r at 60. We reject the county's collateral estoppel argument.

### b. *Equitable Estoppel*

■ ■ ¶37 The county asserts that because the organizations filed nonprofit corporate forms with the IRS, and because the employees participated in certain benefits programs available only to private employees, and organized in labor unions with representatives certified by the National Labor Relations Board, Dolan is equitably estopped from claiming PERS benefits. Equitable estoppel requires (1) an admission, act, or statement inconsistent with a later claim; (2) another party's reasonable reliance on the admission, act, or statement; and (3) injury to the other party that would result if the first party is allowed to contradict or repudiate the earlier admission, act, or statement. *Lybbert v. Grant County*, 141 Wn.2d 29, 35, 1 P.3d 1124 (2000) (quoting *Bd. of Regents v. City of Seattle*, 108 Wn.2d 545, 551, 741 P.2d 11 (1987)). Perhaps because King County required the defender organizations to give the appearance of being private, the county is arguing the employees cannot now claim to be public employees. But it

is difficult to understand how the county relied on their private status, or what else the employees should have done. Moreover, accepting the county's argument would elevate form over substance. That is clearly contrary to the scheme laid out by the legislature and DRS. *See* RCW 41.40.010(12); WAC 415-02-110. The county's equitable estoppel argument is not convincing, and we reject it as well.[21]

## CONCLUSION

¶38 We affirm the trial court's determination that employees of the agencies are also county employees for the purposes of PERS. We hold that King County has such a right of control over the defender organizations that they are arms and agencies of the county. We remand to the trial court for further proceedings consistent with this opinion.

OWENS and FAIRHURST, JJ., and LEACH and SANDERS, JJ. PRO TEM., concur.

¶39 C. JOHNSON, J. (dissenting) — The majority effectively rewrites two separate contracts and concludes that Kevin Dolan is an employee of King County (County), without ever examining or mentioning the contracts and, more troubling, explaining why the contracts need judicial rewriting. The easy answer in this case is that a contract exists to provide indigent criminal defense for the County under which employees do not qualify for enrollment in the Public Employees Retirement System (PERS) and are not state "employees" under RCW 41.40.010(12). In this case, Dolan was not hired by the County, does not get paid by the

---

[21] The dissent makes a similar argument, claiming that the organizations can "realize the benefits of being both a private employer and an agency of the County." Dissent at 328. We make no such holding. There may well be collateral consequences for the public defender organizations resulting from their status as arms and agencies of the State. But those consequences are not now before us.

County, does not receive assignments from the County, cannot be disciplined by the County, and is not terminable by the County; still the majority concludes that Dolan is an employee of the County. The majority's result is implausible, if not exactly backward.

¶40 The issue before the court centers on whether the County's contracts with four private, nonprofit public defender corporations exert such control over the methods and means of the indigent legal defense work being performed as to make the County the employer of workers of these four corporations. Since the contracts with the County provide the only measure of control the County has over the corporations, these contracts should begin, and largely end, our inquiry. But rather than explaining specifically which provisions in the contracts make the corporations subject to the County's control, the majority earnestly avoids analyzing the extent of control the County is capable of exerting on the legal services provided by these corporations. By doing so, the majority dislodges well-established common law rules regarding employer-employee relationships and muddles the factors that merit consideration in determining whether a worker contracted by the government is an employee or an independent contractor.

¶41 No question is really presented that the fundamental common law distinction between employees and independent contractors is that an employee works under an employer who has the right to control the details of work performance, while an independent contractor is one who undertakes a project but is left free to do the assigned work and to choose the method of accomplishing it. *Hollingbery v. Dunn*, 68 Wn.2d 75, 79-80, 411 P.2d 431 (1966). The statute governing PERS eligibility also defines an "employee" in terms of the common law test concerning control over the performance of the work. RCW 41.40.010(12) (An "employee" is "a person who is providing services for compensation to an employer, unless the person is free from the employer's direction and control over the performance of

work."). The Department of Retirement Systems (DRS) employs this "right to control" test as a threshold rule when administering PERS eligibility. WAC 415-02-110(2)(b). While the DRS also looks to additional nondeterminative factors to focus its inquiry, *see* WAC 415-02-110(2)(d)(i)-(xix), these factors are utilized because they tend to establish day-to-day control over the work being performed. *Hollingbery*, 68 Wn.2d at 80-81. But as our common law establishes, control over the manner and means of the work being performed remains the "crucial factor" in determining whether a worker is an employee or independent contractor. *Hollingbery*, 68 Wn.2d at 81.

¶42 In the contracts, the County provides express representations of the terms and conditions forming the essence of the County's relationship with the indigent public defense corporations. The corporations are "nonprofit law firm[s] . . . organized and operated exclusively for the purpose of providing court-appointed legal services to indigent persons." Clerk's Papers (CP) at 5690 (2007 Associated Counsel for the Accused (ACA) Contract).[22] Both the County and the corporations "agree that these legal services are provided by an independent contractor non-profit corporation." CP at 5690 (2007 ACA Contract). Additionally, both parties "agree that any and all funds provided pursuant to this Contract are provided for the sole purpose of provision of legal services to indigent persons." CP at 5690 (2007 ACA Contract). Both parties also agree to indemnify the County for the corporation's acts because "the Agency is an independent contractor, and neither it nor any of its officers, directors, employees, subcontractors, agents, or representatives are employees of the County for any purpose." CP at 5696 (2007 ACA Contract). The contracts do not bind the parties to an extended relationship because the contracts expire after one year and, consequently, must be

---

[22] The contracts for each of the four public defense corporations are substantially similar. Given that the contracts generally mirror one other, citation to each individual contract is unnecessary.

renegotiated annually. CP at 5691 (2007 ACA Contract). Importantly, either party may terminate the contract before the full term if the other party's conduct constitutes a material breach of the contractual terms. CP at 5694-95 (2007 ACA Contract). These provisions indicate that the parties structured their contracts to create an independent contractor relationship primarily because that is what the contracts say.

¶43 Even examining the contracts closely, it becomes readily apparent that the County neither exercises nor possesses control over how individuals within these corporations accomplish their public defense work. Each corporation is governed by an independent board of directors and the County has no influence over the selection of board members. CP at 5705 (2007 ACA Contract). Each corporation has a managing director selected by this independent board. CP at 5706 (2007 ACA Contract).[23] Each corporation hires its own employees without seeking approval from the County. CP at 3088-91 (Mikkelsen Decl.). Each corporation sets the level of pay of its employees. Each corporation conducts performance evaluations of its employees. CP at 2854 (Chapman Decl.). Each corporation disciplines its own staff. CP at 2854 (Chapman Decl.). Each corporation determines which benefits—health, disability, retirement, etc.—it will offer its employees and in what amount. CP at 2829 (Chapman Decl.). Each corporation, without County involvement, decides whether to terminate an employee. CP at 3105-06 (Mikkelsen Decl.). In short, the indigent public defense corporation, in hiring employees, controls when they will work, where they will work, and which cases they are assigned. If an employee fails to perform, the corporation that hired the employee can then fire him or her. The County has no influence over the means and manner in which the employee's work is performed, or even whether the employee will continue to be employed. Put simply, the

[23] Despite this, the majority curiously finds that the County exerts "stringent control" over the organizational structure of these corporations. Majority at 319.

contracts empower the County to tell the corporations what must be done, but the corporations control how Dolan must then do it. In most all cases concerning whether a worker is an employee or an independent contractor, we would end our inquiry there.[24]

¶44 But the majority seemingly disregards these aspects governing the day-to-day control of the work being performed and purports to find the County's right to control the performance of work in other aspects of the relationship between the corporations and the County. Without telling us precisely which contracts control its decision or revealing how far back our inquiry must extend (the corporations' contracts are renegotiated and change annually), the majority points to some aspects of the relationship between the corporations and the County to substantiate its result. The majority relies on such things as the corporations must receive county approval prior to working with other clients; the corporations cannot enter into leases or acquire valuable assets without county approval; and the County provides the bulk of these corporations' revenue.[25] Majority at 318-20.

¶45 But none of these aspects of the relationship show how the County controls the method and manner of the indigent defense work performed by the corporations, only that the County legitimately included terms into its contracts to ensure adequate performance of the services provided. Since the corporations are "operated exclusively for the purpose of providing court-appointed legal services to indigent persons," the County has a valid interest to include contractual terms ensuring that these corporations expend public money solely on functions related to indigent

---

[24] Presumably the majority's reasoning extends to all the public defense corporations' employees, including paralegals, investigators, support staff, and others.

[25] The majority cites to no legal authority in this state that a service provider that has primary financial dependence on one contract is thereby intrinsically under the control of its primary client.

public defense. CP at 5690 (2007 ACA Contract). The County is not subsidizing a private law firm. It is expending public money for public defense purposes. But the contractual provisions the majority hinges its decision on only exemplify how the County provides genuine oversight over the expenditure of public money, not how the County exerts control over indigent defense work performed. With this, the majority decision effectively undercuts the distinction between watchful caution and control; a fundamental principle well rooted in our employer-employee common law. *Kamla v. Space Needle Corp.*, 147 Wn.2d 114, 120-21, 52 P.3d 472 (2002) (" ' "The retention of the right to inspect and supervise to [e]nsure the proper completion of the contract does not vitiate the independent contractor relationship." ' " (quoting *Hennig v. Crosby Grp., Inc.*, 116 Wn.2d 131, 134, 802 P.2d 790 (1991) (quoting *Epperly v. City of Seattle*, 65 Wn.2d 777, 785, 399 P.2d 591 (1965)))); *see also Fardig v. Reynolds*, 55 Wn.2d 540, 545, 348 P.2d 661 (1960) (no "control" when only interaction between parties was "supervisory" to determine "whether or not [the work was] being done in accordance with the contract").[26] The majority dismissively avoids applying our prior employer-employee common law rules, but troublingly, the majority does not provide this court any new rule to apply going forward.

¶46 The majority decision also ignores the plain contractual declarations indicating the intentions of the contracting parties. While the majority is correct in stating that contractual language does not conclusively determine the status of the corporations' workers, this court's precedent has long held that the instrument itself may show which type of relationship the parties intended. *Hollingsworth v. Robe Lumber Co.*, 182 Wash. 74, 79, 45 P.2d 614 (1935). In this case, the contracts expressly state that "the County and the Agency agree that these legal services are provided by

---

[26] A number of the County's supervisory requirements are mandated by statute. Therefore, the County was required to include such provisions. *See* RCW 10.101.060.

an independent contractor non-profit corporation." CP at 5690 (2007 ACA Contract). While the majority reasons that we should ignore the express contractual language stating that the indigent defense corporations are independent contractors, the majority offers no explanation why we should ignore the fact that members of the class have beneficially relied on this same language when asserting their rights as a private employer, namely in unionizing and privately negotiating collective bargaining agreements. CP at 2997 (Farley Decl.), 3094-95 (Mikkelsen Decl.), 5183-225 (Ex. 145). The corporations have also tacitly endorsed other declarations and terms in their contracts. For example, the corporations declare themselves in their contracts as "non-profit law firm[s]" and file annual tax returns accordingly. CP at 5690 (2007 ACA Contract); see, e.g., CP at 6146 (The Defender Association tax exemption form). The majority's decision effectively allows these corporations to pick and choose which contract provisions they wish to follow depending on the circumstances; they can realize the benefits of being both a private employer and an agency of the County. If a reason exists for allowing the corporations to rely on their contractual declarations but not the County, the majority never reveals it.

¶47 The majority's decision judicially overwrites the intended contractual terms between the County and the indigent defense corporations and sidesteps our common law principles regarding independent contractor relationships. The effect of the majority's decision is to ghostwrite financial terms for pension funding into the parties' contracts, even though the corporations could negotiate with the County on their own accord to accomplish the same result, either now or during their annual contract renewal. Furthermore, if an employee desired to increase his retirement package, he or she could have done so by negotiating with the corporation that employee works for. But these employees are not asking this court to rewrite their employment contract with the indigent defense corporation that

hired them; these employees ask this court to rewrite their employer's contract with the County for their benefit, which the majority does. But even as the majority scribbles its own language into the contracts, the majority fails to tell us how the County should have structured its contracts to avoid inadvertently creating an employer-employee relationship with these corporations; a relationship that, from the contractual terms, the County certainly wished to avoid. Since the majority does not provide a clear rule for when an employer-employee relationship develops, perhaps the County will figure its only recourse now is to not renew its existing contracts and explore alternative avenues of providing its constitutionally mandated indigent public defense.

¶48 The majority appears to rest its decision on contractual provisions permitting the County to supervise the end-level quality of the product it bargained for.[27] But the existence of an employer-employee relationship should not be inferred from contractual provisions reserving the power to monitor performance when such provisions do not deprive the person doing the work the power to command how the work is done. Rather than adhering to settled common law principles and looking to which party controls the worker's day-to-day job performance, the majority judicially rewrites these public indigent defense contracts while providing no clear guidance or rule applicable to future cases involving government contracts with third-party corporations.

¶49 Since the County's contracts with these indigent defense corporations do not provide for control over the means and manner of the legal services provided, I would

---

[27] It is reasonable to presume that contractual provisions providing for quality assurance and for contract compliance exist in every government contract. Under the majority's reasoning, this places numerous government contracts with independent contractors at risk of being misconstrued as creating employer-employee relationships.

hold that the trial court erred in determining that the class members were PERS-eligible "employees."

¶50 I dissent.

ALEXANDER, J.M. JOHNSON, and STEPHENS, JJ., concur with C. JOHNSON, J.

After modification, further reconsideration denied January 10, 2012.