IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CITY OF BELLEVUE, a Washington municipal corporation, | ) ) ) | No. 71827-4-I |
| | ) | DIVISION ONE |
| Respondent, | ) ) | |
| v. | ) ) | |
| PINE FOREST PROPERTIES, INC., a Washington corporation, | ) ) ) ) | |
| Appellant, | ) ) | PUBLISHED OPINION |
| and | ) ) | |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation; PRUDENTIAL ASSET RESOURCES, INC., a Delaware corporation; SHAREBUILDER CORPORATION, a Washington corporation; CLEARWIRE LEGACY, LLC, a Delaware limited liability company, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | FILED: December 22, 2014 |

SCHINDLER, J. — Property owner Pine Forest Properties Inc. appeals the

determination of public use and necessity and the order authorizing the city of Bellevue

(City) to condemn property for construction staging during the expansion of the Central

Puget Sound Regional Transit Authority (Sound Transit) light rail system from downtown

Seattle to the east side, the "East Link Project," and road improvement construction projects. Pine Forest contends that absent an identified permanent use, condemnation of the property for construction staging is neither a public use nor a necessity. The Washington State Supreme Court decision in HTK Management, L.L.C. v. Seattle Popular Monorail Authority (Monorail), 155 Wn.2d 612, 121 P.3d 1166 (2005), controls. In Monorail, the court held that the decision of the condemning authority as to the type and extent of property interest necessary to carry out the public purpose is a legislative question subject to a deferential standard of review. Monorail, 155 Wn.2d at 634-35. We affirm the determination of public use and necessity and the order authorizing the City to condemn the property.

## FACTS

In March 1990, the Washington State Legislature passed "AN ACT relating to high capacity transportation systems," Substitute House Bill No. 1825. LAWS OF 1990, ch. 43.[1] The legislature states that "[i]ncreasing congestion on Washington's roadways calls for identification and implementation of high capacity transportation system alternatives" and requires local jurisdictions to "coordinate and be responsible for high capacity transportation policy development, program planning, and implementation." LAWS OF 1990, ch. 43, § 22.[2]

On November 4, 2008, voters approved the Central Puget Sound Regional Transit Authority (Sound Transit) proposal to expand the existing link light rail from

---

[1] The legislation defines a "high capacity transportation system" as:

[A] system of transportation services, operating principally on exclusive rights of way, which taken as a whole, provides a substantially higher level of passenger capacity, speed, and service frequency than traditional public transportation systems operating principally on general purpose roadway rights of way.

LAWS OF 1990, ch. 43, § 22.

[2] As amended, codified at RCW 81.104.010.

2

downtown Seattle to Mercer Island, south Bellevue, downtown Bellevue, Bel-Red, the area between State Route 520 and Bel-Red Road, and Overlake, the "East Link Project."

In February 2009, the Bellevue City Council (City Council) adopted a long-term land use and transportation plan for the Bel-Red area. The "Bel-Red Plan" identifies the anticipated light rail station at 120th Avenue NE and related road improvement projects, including the need to extend and expand NE 15th Street between 116th Avenue NE and 120th Avenue NE.

On November 15, 2011, the city of Bellevue (City) and Sound Transit entered into an interlocal agreement for the East Link Project, the "Umbrella Memorandum of Understanding for Intergovernmental Cooperation Between the City of Bellevue and the Central Puget Sound Regional Transit Authority for the East Link Project" (MOU).

The MOU states that Sound Transit and the City have a joint interest in ensuring "a high-quality investment for taxpayers, the City and Sound Transit." In recognition of the "mutual benefits of a tunnel alignment through downtown Bellevue" and a "high capacity light rail system to meet long-term regional transportation needs," the City agreed to facilitate construction of the light rail system and contribute $160 million. The contribution includes the agreement to acquire designated property needed for the East Link Project.

Pine Forest Properties Inc. owns approximately 11.6 acres in the Bel-Red area. The property is located near the anticipated East Link light rail station at 120th Avenue NE. One of the parcels designated for acquisition in the MOU is a parcel owned by Pine Forest, parcel number 1099100005. Parcel number 1099100005 is a 238,097

square-foot lot located at 1445 120th Avenue NE. The MOU specifically identifies the "Type of Take" of the designated parcel located at 1445 120th Avenue NE as a "Full Take." The City agreed to "deliver the Property to Sound Transit no later than June 2015."

Sound Transit plans to use the parcel to construct a permanent fixed "Guideway" system on the property and for construction staging. The City plans to use the property "to construct the extension of NE 15th Street across the Property in order to provide an arterial connection between 116th Avenue NE and 120th Avenue NE," and for construction staging.

On April 24, 2013, Pine Forest submitted an application for a proposed master development plan (MDP) to the City. Pine Forest proposes converting the 8.2 acres at the intersection between 1415 and 1445 120th Avenue NE, NE 15th Street, and 120th Avenue NE "from office/industrial/warehouse use to a mixed-use transit-oriented development connected to the future light rail station." The majority of the 8.2 acres is located south of the parcel designated for acquisition in the MOU.

The MDP application identifies the Sound Transit East Link Project and the "Bel-Red Transportation Improvement Plan" as projects "directly affecting" the MDP proposal.

> Sound Transit has adopted the East Link Light Rail alignment plans that require acquiring Pine Forest property from the north parcel. The City of Bellevue has adopted the Bel-Red Subarea Plan and Transportation Improvement Plans that include a widened 120th Avenue NE and a new NE 15th Street. These new and expanded roadways will require acquiring additional property from the north and eastern portions of the Pine Forest property.

On August 14, 2013, the City notified Pine Forest that on September 3, the City Council was scheduled to take final action on adoption of an ordinance that would authorize condemnation of the parcel it owned at 1445 120th Avenue NE. The notice states, in pertinent part:

> This letter provides notice that the Bellevue City Council is scheduled to vote (take final action) to adopt an ordinance authorizing acquisition of your property at 1445 120th Avenue NE, Bellevue, Washington. The purpose of the ordinance is to authorize staff to pursue property acquisition, including through the condemnation process if necessary, to facilitate the completion of the East Link Project, East Link MOU Commitments, referred to as CIP [(Capital Investment Program)] Plan No. PW-R-181, as well as the NE 15th Street (Zone 1) - 116th to 120th Avenue NE Project, referred to as CIP Plan No. PW-R-172.

On September 3, 2013, the City Council passed Ordinance No. 6122. Ordinance No. 6122 authorizes condemnation of the property located at 1445 120th Avenue NE for the East Link Project and the NE 15th Street to 120th Avenue NE road improvement project. The City Council found that condemnation of the property was necessary to implement the MOU and for construction of NE 15th Street from 116th Avenue NE to 120th Avenue NE. Ordinance No. 6122 states, in pertinent part:

> WHEREAS, the City Council finds that the public health, safety, necessity and convenience demand, that the NE 15 Street (Zone 1) and East Link projects be undertaken at this time, and that in order to carry out the projects and implement the terms of the Memorandum of Understanding in furtherance of the East Link Project, it is presently necessary for the City to acquire interests and rights to the property described herein; and
>
> WHEREAS, the City Council finds and declares it necessary and in the best interest of the public that interests in the land and property hereinafter described be condemned, appropriated, and taken for public use, subject to the making or paying of just compensation to the owners thereof; now, therefore,
>
> THE CITY COUNCIL OF THE CITY OF BELLEVUE, WASHINGTON, DOES ORDAIN AS FOLLOWS:

5

Section 1. The land and property rights within the City of Bellevue, King County, Washington, commonly known as 1445 120th Avenue NE (Tax Parcel No. 109910-0005) as now legally described in Exhibit "A" and generally depicted on Exhibit "B", are necessary both to implement the Memorandum of Understanding in furtherance of the construction of the East Link Project and for the construction of NE 15th Street from 116th Avenue NE to 120th Avenue NE (referred to as Zone 1), all as described above, subject to making or paying just compensation to the owners thereof in the manner provided by law.

The City retained an appraiser and a review appraiser to determine the amount of just compensation for the property. In a letter to the City dated October 16, Pine Forest disagreed with the valuation and objected to condemnation of approximately 84,000 square-feet of the 238,097 square-foot parcel for construction staging. Pine Forest agreed "to allow use of the construction staging area by way of a temporary ground lease" subject to a number of conditions. The conditions included agreement on a specific expiration date, a monthly net rental payment, and holdover costs. Pine Forest claimed the proposal would save the City $4 million "when compared to a fee simple purchase." The letter states, in pertinent part:

b. **Term expiration**: No later than 2 years prior to completion of the 120th Avenue Sound Transit Station. A specific expiration date shall be determined and agreed upon by the City and Pine Forest prior to the City's purchase of the Right of Way Area. Upon expiration, the site shall be turned over clear of any improvements or equipment.

c. **Compensation**: The monthly net rental payment during the term of the ground lease shall be $33,620. Holdover rent for occupancy of the Temporary Use Area beyond the expiration date shall be $67,240.[3]

Over the course of the next several months, the City and Sound Transit met with Pine Forest to discuss the proposal. Because "significant design, scheduling, and coordination decisions" had not been made with respect to the East Link Project or with

---

[3] Emphasis in original.

6

respect to the Bel-Red Transportation Improvement Plan, Sound Transit and the City decided to proceed with condemnation of the property. Sound Transit and the City concluded that "fee simple acquisition minimizes complications, and the potential for additional costs, for both Projects."

On October 18, the City filed an eminent domain petition in King County Superior Court. The scheduling order set December 2 as the deadline to file the motion for a public use and necessity hearing and December 13 as the deadline to file a jury demand. On November 27, the court granted the joint motion to change the deadlines to allow additional time to "continue ongoing discussions." On January 7, 2014, the parties filed another motion to change the deadlines in order to pursue settlement negotiations. The court granted the motion and changed the deadline to file the motion for a public use and necessity hearing to January 21.

On January 21, the City filed a motion to determine public use and necessity. The City argued that under the MOU and Ordinance No. 6122, construction of the East Link Project and the NE 15th Street road project is a public use and condemnation of the property is necessary. In support, the City submitted the declaration of Capital Projects Manager Rick Logwood. Logwood states condemnation of the property is necessary to construct the East Link Project and implement the MOU, and to "expand 120th Avenue NE along the eastern frontage of the Property [to] construct the extension of NE 15th Street across the Property in order to provide an arterial connection between 116th Avenue NE and 120th Avenue NE."

Logwood describes the long-term need to use a portion of the property for construction staging for the East Link Project and the road construction project.

Logwood states that "there are remaining decisions that have not yet been made, which could increase the amount of property needed to construct" the East Link Project and the Bel-Red Transportation Improvements. Logwood asserts the City "also will need to coordinate its construction of the Bel-Red Transportation Improvements with Sound Transit and is still in the process of discussing those details with Sound Transit."

Logwood states that Sound Transit will need to use the southeastern portion of the property for construction staging "for as long as eight years." Although the 2013 to 2019 CIP budget includes a majority of the funding to widen 120th Avenue NE and "funding for 60% of the design for the extension of NE 15th Street," Logwood states that "full implementation of the extension of NE 15th Street likely would occur between 2030 and 2040" but the schedule "could be accelerated to the period of 2020 to 2030."

Pine Forest filed a partial opposition to the motion to determine public use and necessity. Pine Forest conceded public use and necessity to acquire approximately two-thirds of the parcel for the East Link Project and road improvement project. Pine Forest objected to condemnation of approximately 84,000 square-feet or one-third of the property for construction staging. Pine Forest argued that because the City had not identified a future permanent use, condemnation of the property for temporary construction staging did not constitute a public use.

In support, Pine Forest submitted the declarations of Pine Forest Chief Executive Officer Fred Burnstead, Pine Forest Asset Manager Matt Wickens, and Burnstead Construction LLC Director of Land Development Tiffiny Brown.

8

Burnstead concedes that Sound Transit and the City will need "temporary use" of the property for construction staging, and that "Sound Transit is still completing its design of the East Link" and the City "is still in preliminary design for the NE 15th Street Project." But Burnstead asserts that because Pine Forest "will agree to reasonable terms" and a cost savings of 14 percent as compared to taking a fee interest in the entire parcel, there is no need to acquire the property.

Wickens also concedes funding and design for the City's road improvement project is uncertain but states Pine Forest had agreed to provide the City with access for the NE 15th Street project.

> Recently, the City has expressed concern about City access to the Pine Forest . . . Property for future construction of NE 15th Street. Both the timetable for the NE 15th Street Project and the funding for design and construction of the Project are still uncertain. Pine Forest then assured the City that Pine Forest would provide the City with whatever use and access the City required for the NE 15th Street Project.

Wickens further states that "if markets allowed, Pine Forest could start work on its Phase 1 to coincide with the opening of the Light Rail Station," and that Pine Forest and Sound Transit had agreed that Sound Transit "could use the Pine Forest property through the conclusion of its heavy civil construction of the Guideway for the East Link adjacent to the Pine Forest Property."

Brown also states that Sound Transit agreed to return the property to Pine Forest "after the completion of the heavy civil construction on the East Link Guideway." Brown states, "It was agreed the time frame for the Sound Transit temporary use of the property was . . . approximately 6 to 7 years," and if approved, "[t]he new NE 15th Street will ultimately become a major entry" to the proposed MDP.

9

In response, the City submitted the declaration of the attorney representing the City, the declaration of Sound Transit Senior Real Property Agent Kent Melton, and the reply declaration of Rick Logwood.

The attorney states that Burnstead, Wickens, and Brown "mischaracterize settlement proposals made by Pine Forest as 'agreements' reached by Pine Forest, Sound Transit, and the City, when no such agreements have been made." The attorney asserts that "there has been no agreement on the duration of Sound Transit's and the City's use of the Property."

Melton asserts Sound Transit did not agree to return the property to Pine Forest after completion of construction of the East Link Guideway. Melton states Sound Transit is still in the process of planning construction and coordinating with the City, and the duration for use of the property is not yet determined. Melton also points out that because the City is responsible for acquiring the property, Sound Transit could not agree to return the property.

> While it is true that Pine Forest has requested that Sound Transit agree to vacate portions of the Property that Sound Transit needs only temporarily at the conclusion of heavy civil construction of the East Link Guideway, to date no such agreement has been made. Sound Transit is still in the process of planning the construction of the East Link Project in the area of the Property and is still in the process of coordinating that construction with the City. Although Sound Transit has established an estimated construction schedule for the East Link Project, that schedule is subject to change as the project develops. Thus, the duration of time that Sound Transit will need to use the temporary interests in the Property to construct the East Link guideway and for construction staging purposes is still being determined.
> . . . Moreover, because the Memorandum of Understanding provides that the City will purchase the Property prior to construction, Sound Transit would not have been in a position to agree to return the temporary interests in the Property to Pine Forest in any event.

In his reply declaration, Logwood states that "[a]t no time in any of these meetings was it ever agreed that Sound Transit would return use of the Property to Pine Forest after the completion of heavy civil construction on the East Link Guideway on the Property." Logwood states there is no "fixed . . . time frame for Sound Transit's temporary use of the Property." Logwood reiterates that the City and Sound Transit are still in the process of "planning, scheduling, and coordinating with respect to the construction of the East Link Project on the Property," and that the City and Sound Transit have not "finalized how the City will coordinate construction of the Bel-Red Transportation Improvements with the construction of the East Link Project."

According to Logwood, the potential time line described by Wickens is a "Draft Conceptual Coordination Schedule" that was "prepared solely for the purposes of the City's discussions with Pine Forest and Sound Transit regarding whether there was any possibility these projects could be coordinated." Logwood again notes that completion of the design and construction of the NE 15th Street project is "unfunded at this time," and the "decision on whether to accelerate the NE 15th Street Project has not yet been made and may not be made for another year or more."

Logwood also addresses Pine Forest's proposal to enter into a long-term lease. Logwood states the proposal relies on the false assumption that the City "will need to use a portion of the Property for construction staging for only six years," and "what Pine Forest describes as 'savings' is actually just the purchase of a smaller amount of property at the same per square foot price, plus additional costs associated with a ground lease." Logwood further states, in pertinent part:

> Additionally, as set forth above, there are no guarantees that the City will need the temporary use area for only ten years, and in fact, the possibility

11

remains that the duration of temporary use could be much longer. Thus, in consultation with its appraiser and review appraiser, the City has determined that it would be more cost effective to acquire the Property in fee simple than to agree to Pine Forest's proposal.

According to Logwood, the City and Sound Transit concluded the proposal to enter into a long-term lease would impose significant limitations and further complicate the construction of "two extremely complex public infrastructure projects." Based on the long-term need to use the property for construction staging, the City "decided to acquire the Property in fee simple." In addition, Logwood explained that because of "the potential that Sound Transit's and/or the City's permanent use areas on the Property could shift or increase . . . , a fee simple acquisition minimizes complications, and the potential for additional costs, for both Projects." Logwood also notes that Pine Forest consistently stated that if the proposed MDP were approved, it would proceed with the project "only if market conditions permit and, thus, there are no guarantees that Pine Forest's project would be constructed at the same time as the City's projects."

At the public use and necessity hearing on March 7, 2014, Pine Forest submitted a letter dated February 18. The letter proposes selling two-thirds of the property to the City and providing a temporary easement to the other one-third of the property. The proposal is subject to an agreement "on a timetable that provides flexibility for the City, and provides certainty that the property will be returned to Pine Forest."

The court ruled the City met its burden of establishing public use and necessity. The court concluded public transportation is a public use: the "intended use of the Property for transit and transportation purposes is undeniably a public use for all of the Property." The court also concluded the City "reasonably determined that it requires the Property in fee simple," and "Pine Forest has not established that the City's

12

determination that it requires the Property in fee simple for the East Link Project and the Bel-Red Transportation Improvements was the result of actual fraud or constructive fraud."

The court entered extensive findings of fact, conclusions of law, and an order determining public use and necessity. The conclusions of law state, in pertinent part:

7. Public transportation is a public use justifying condemnation.

8. The City is authorized to exercise its eminent domain power for purposes of transportation and to allow Sound Transit to use its property to construct a light rail system pursuant to RCW 8.12.030, RCW 35A.64.200, RCW 81.104.010, RCW 81.112.080, RCW 35A.11.010, RCW 39.34.010, and RCW 39.34.060.

9. Roads, sidewalks, and other transportation facilities constitute public uses justifying condemnation.

10. The Legislature has authorized the City to construct and expand roads, sidewalks, gutters, curbs, and bicycle paths pursuant to RCW 35.68.010, RCW 35A.47.020, and RCW 35.75.010. The Legislature has also authorized the City to exercise its eminent domain power for these purposes pursuant to RCW 8.12.030 and RCW 35A.64.200.

. . . .

14. The potential condemnor's determination of public interest and necessity, including the type and extent of property interest, is conclusive absent proof of actual fraud or such arbitrary and capricious conduct as would constitute constructive fraud.

15. The City need only prove reasonable necessity, not absolute, indispensable, or immediate need in order to condemn the Property. The question is not whether there is other land to be had that is equally available; the question is whether the land sought is needed for the construction of public work. The City is not required to have a public use planned for the Property forever.

16. The City Council's determination that the East Link Project and the Bel-Red Transportation Improvements are necessary and in the best interests of the citizens and that condemnation of the Property in fee simple is necessary for these projects, is conclusive evidence of public interest and necessity. There is no evidence that this determination was the result of actual fraud or such arbitrary and capricious conduct as would constitute constructive fraud.

. . . .

18. The Property is necessary for the East Link Project and the Bel-Red Transportation Improvements.

19. The public interest requires the East Link Project and the Bel-Red Transportation Improvements.

20.　The City is entitled to the issuance of an order determining public use and necessity for the taking of the Property in fee simple for the East Link Project and the Bel-Red Transportation Improvements.

Pine Forest filed an appeal. The City filed a motion for accelerated review. The City argued delay in resolution of the appeal would result in significant disruption and adverse construction consequences for the East Link Project. We granted the motion for accelerated review.

ANALYSIS

Pine Forest challenges the determination of public use and necessity and the order authorizing the City to condemn one-third of the property for construction staging. Pine Forest asserts the City did not meet its burden of establishing either public use or necessity to obtain a fee interest in the portion of the parcel Sound Transit and the City plan to use for construction staging.

In determining public use and necessity, a trial court must make three separate but interrelated findings: (1) whether the proposed use is really public, (2) does the public interest require it, and (3) is the property to be acquired necessary for that purpose. HTK Mgmt., L.L.C. v. Seattle Popular Monorail Auth. (Monorail), 155 Wn.2d 612, 629, 121 P.3d 1166 (2005). The latter two findings address necessity. In re City of Seattle, 104 Wn.2d 621, 623, 707 P.2d 1348 (1985). Although the terms overlap, a determination that an acquisition is for public use is not precisely the same as determining it is a public necessity. Monorail, 155 Wn.2d at 629.

14

Public Use

The question of whether the contemplated use is really a public use is a judicial question without regard to a legislative assertion that the use is public. WASH. CONST. art. 1, § 16 (amend. 9). Article I, section 16, amendment 9 of the state constitution states, in pertinent part:

> Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public.

As authorized by the voters, Sound Transit plans to extend the light rail system and construct the East Link. To facilitate construction of the East Link, Sound Transit and the City entered into a MOU and the City agreed to acquire certain designated properties, including the parcel owned by Pine Forest. In conjunction with the East Link Project, the City plans to construct an extension of NE 15th Street "to improve access, circulation, and mobility options."

Without question, condemnation of the property for construction of the East Link Project and the City's road improvement project is a public use. See RCW 8.12.030, RCW 35A.64.200, RCW 81.104.010, RCW 81.112.080, RCW 35A.11.010, RCW 39.34.010, and RCW 39.34.060 (authorization to exercise eminent domain for purposes of transportation and to construct light rail system); see also RCW 35.68.010, RCW 35A.47.020, and RCW 35.75.010 (authorization to construct and expand roads).

Pine Forest tries to characterize the type and extent of the property interest the City seeks to condemn as a question of public use rather than necessity. Pine Forest claims that absent an identified permanent use for the property, the decision to obtain fee title for the temporary use for construction staging is a question of public use. The

Washington State Supreme Court considered and rejected the same argument in the Monorail case.

In Monorail, the condemning authority "need[ed] the entire property for construction of the staging and development of the [rail] alignment" for the first 5 to 10 years, but had not approved a plan for use of the property "outside of the footprint." Monorail, 155 Wn.2d at 620, 633.

> Although the monorail station is not likely to take up the entire footprint of the property, the record indicates that the remaining portion of the property could be used for at least 10 years for construction and remediation of property in downtown Seattle. . . . In this case, for the first 5-10 years, a substantial portion of the property will be put to public use and only after that time is there a possibility that the property may be sold.

Monorail, 155 Wn.2d at 633.

The property owner argued that the "decision to condemn a fee interest in the entire property should be analyzed under the first prong of the test for 'public use,' rather than under the third prong of the test for 'necessity.' " Monorail, 155 Wn.2d at 630. The Supreme Court rejected the property owner's argument.

The court held that "determinations by the condemning authority as to the type and extent of property interest necessary to carry out the public purpose have historically been considered legislative questions and are thus analyzed under the third prong of the test." Monorail, 155 Wn.2d 630; see also Pub. Util. Dist. No. 2 of Grant County v. N. Am. Foreign Trade Zone Indus., LLC (NAFTZI), 159 Wn.2d 555, 575-76, 151 P.3d 176 (2007) (emphasizing that a claim that excess property has been taken is addressed under the necessity prong). The Supreme Court held that use of the property for construction staging was a public purpose even though the condemning authority did not identify "a public use planned for property forever." Monorail, 155

16

Wn.2d at 634[4]; see also NAFTZI, 159 Wn.2d at 575 ("a public entity need not plan to use condemned property for public purpose forever to justify the initial public use").[5]

Necessity

Pine Forest asserts that even if the temporary use of the parcel for construction staging is a public use, the City did not meet its burden of proving condemnation of a fee interest in the property is necessary.

Pine Forest contends the court erred in ruling that the City's decision as to the "type and extent of property interest . . . is conclusive absent proof of actual fraud or such arbitrary and capricious conduct as would constitute constructive fraud." Pine Forest argues the court erred in requiring Pine Forest to demonstrate actual or constructive fraud rather than arbitrary or capricious conduct.[6] We disagree.

A party challenging the legislative determination of necessity must establish "arbitrary and capricious conduct amounting to constructive fraud." NAFTZI, 159 Wn.2d

---

[4] Emphasis in original.

[5] The cases Pine Forest cites in support of its argument that the type and extent of the property interest is a question of public use rather than necessity are inapposite. In In re the Petition of City of Seattle (Westlake), 96 Wn.2d 616, 634, 638 P.2d 549 (1981), the city planned to sell or lease a significant portion of the property in order to "provide additional shopping opportunities in the core of the City's shopping area." The court held the project as a whole did not constitute a public use because its "primary purpose" was private retail development. Westlake, 96 Wn.2d at 629. In State ex rel. Washington State Convention & Trade Center v. Evans, 136 Wn.2d 811, 966 P.2d 1252 (1998), the court held that private retail development in the vacant space below the exhibit hall was "merely incidental" and "[t]he relevant inquiry is whether the government seeks to condemn any more property than would be necessary to accomplish purely the public component of the project." Evans, 136 Wn.2d at 822-23 (emphasis added). City of Seattle v. Faussett, 123 Wash. 613, 212 P. 1085 (1923), and State ex rel. Tacoma School District No. 10 v. Stojack, 53 Wn.2d 55, 330 P.2d 567 (1958), also address necessity, not public use. In Faussett, the court held that a city need not condemn property in fee simple if acquisition of a lesser interest "reasonably satisfies the needs of the particular public use contemplated." Faussett, 123 Wash. at 617-18, 620-21. Likewise, in Stojack, the court held that a school district board of directors has "authority to determine the area of land reasonably necessary to accommodate suitable buildings" for the purpose of public education. Stojack, 53 Wn.2d at 63-64.

[6] Likewise, below, Pine Forest argued the standard was arbitrary and capricious.

It's basic arbitrary and capricious decision-making by the City and manifest use of discretion. That's different. It could ultimately -- if one were to argue about, we could talk about constructive fraud, but we're not even going that far.
The point is, the standard is not fraud. The standard is arbitrary and capricious.

at 577.[7] Whether condemnation of a fee interest in the property is necessary is a legislative question that is conclusive absent proof of "actual fraud or arbitrary and capricious conduct, as would constitute constructive fraud." Monorail, 155 Wn.2d at 629[8]; see also State ex rel. Wash. State Convention & Trade Ctr. v. Evans, 136 Wn.2d 811, 823, 966 P.2d 1252 (1998); City of Tacoma v. Welcker, 65 Wn.2d 677, 684, 399 P.2d 330 (1965); City of Blaine v. Feldstein, 129 Wn. App. 73, 81, 117 P.3d 1169 (2005).

Port of Everett v. Everett Improvement Co., 124 Wash. 486, 214 P. 1064 (1923), is distinguishable. In Everett Improvement, the Port of Everett Commission had neither a present nor a future use for the property it sought to condemn. Everett Improvement, 124 Wash. at 492. There was "no map, plan, specification, or detailed description of the work intended to be constructed." Everett Improvement, 124 Wash. at 492. Absent "some definite stated plan of improvement," the court held "necessity cannot be shown." Everett Improvement, 124 Wash. at 494.

But "nothing in Everett Improvement requires this court to find that the failure to have in place a definitive use plan for the entire life of the property makes the condemning authority's actions arbitrary and capricious." Monorail, 155 Wn.2d at 638 n.21.

Further, here, unlike in Everett Improvement, the undisputed record establishes a long-term need to use the property for construction staging. Neither the final design of the East Link Project nor the City's road improvement project are complete, and the

---

[7] Emphasis added.
[8] Emphasis added.

"remaining decisions that have not yet been made" could increase the extent of the property needed to construct the East Link Project and the road projects.

Pine Forest argues the record does not support the court's findings that the City established condemnation in fee simple and the plan to use the property for construction staging is necessary. When reasonable minds can differ, we will not disturb the decision of the legislative body that necessity exists "so long as it was reached 'honestly, fairly, and upon due consideration' of the facts and circumstances." Cent. Puget Sound Reg'l Transit Auth. v. Miller, 156 Wn.2d 403, 417-18, 128 P.3d 588 (2006) (quoting Welcker, 65 Wn.2d at 684). And although "[t]he decision may be unwise, . . . it is still a decision for the legislative body to make, not this court." Miller, 156 Wn.2d at 418.

Preliminarily, the parties dispute the standard of review. Pine Forest asserts review of the findings is de novo because the record consists entirely of declarations and documentary evidence. The City argues the standard of review is whether substantial evidence supports the finding of necessity.

In Dolan v. King County, 172 Wn.2d 299, 311, 258 P.3d 20 (2011), the Washington State Supreme Court held that where, as here, the trial court reviewed documentary evidence, "weighed that evidence, resolved inevitable evidentiary conflicts and discrepancies, and issued statutorily mandated written findings," a substantial evidence standard of review applies.

> Appellate courts give deference to trial courts on a sliding scale based on how much assessment of credibility is required; the less the outcome depends on credibility, the less deference is given to the trial court. Washington has thus applied a de novo standard in the context of a purely written record where the trial court made no determination of witness credibility. See Smith[ v. Skagit County], 75 Wn.2d [715,] 719[,

453 P.2d 832 (1969)]. However, substantial evidence is more appropriate, even if the credibility of witnesses is not specifically at issue, in cases such as this where the trial court reviewed an enormous amount of documentary evidence, weighed that evidence, resolved inevitable evidentiary conflicts and discrepancies, and issued statutorily mandated written findings. See [In re Marriage of ]Rideout, 150 Wn.2d [337,] 352[, 77 P.3d 1174 (2003)]; Anderson v. City of Bessemer City, 470 U.S. 564, 574-75, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985) (deference rationale not limited to credibility determinations but also grounded in fact-finding expertise and conservation of judicial resources).

Dolan, 172 Wn.2d at 311.[9]

Pine Forest argues substantial evidence does not support the finding that the City "reasonably determined" the need to acquire the property in fee simple. Finding of fact 9 states:

> The City has reasonably determined that it requires the Property in fee simple for the East Link Project and the Bel-Red Transportation Improvements given the permanent need for approximately two-thirds of the total area of the Property, or approximately 160,000 square feet out of a total of approximately 240,000 square feet, and the long-term need to use the remainder of the Property for construction staging, possibly through 2030 and beyond. As Rick Logwood, Capital Projects Manager for the City, testified, "[w]ith significant design, scheduling, and coordination decisions remaining to be made by both South Transit and the City with respect to both the East Link and the Bel-Red Transportation Improvements Projects, a fee simple acquisition minimizes complications, and the potential for additional costs."[10]

Pine Forest does not dispute that the property will be used for construction staging for at least the first several years, that Sound Transit has not completed the design of the East Link Project, and that the City is still in preliminary stages of design for the NE 15th Street project. Sound Transit Senior Real Property Agent Kent Melton testified that "the duration of time that Sound Transit will need to use the temporary interests in the Property to construct the East Link guideway and for construction

---

[9] In any event, we would reach the same conclusion if we applied a de novo standard of review.
[10] Alteration in original.

20

staging purposes is still being determined." Logwood testified the City needs to use the property for staging during the construction of the road projects "possibly through 2030 and beyond." Logwood also testified that the future design decisions create "the potential that Sound Transit's and/or the City's permanent use areas on the Property could shift or increase."

Pine Forest contends the findings do not establish the need to condemn the property because Pine Forest agreed to a construction easement and guaranteed paying a discounted amount for the portion of the property needed for construction staging. Substantial evidence supports the findings that Pine Forest's proposal imposed significant limitations on Sound Transit and the City, and the City "reasonably considered the relative cost of a complete take as compared to a temporary construction easement." Finding of fact 10 and finding of fact 11 state:

> 10.    Pine Forest's proposal regarding how the City and Sound Transit could coordinate their projects with Pine Forest's Transit-Oriented-Development plans includes significant limitations. For example, Mr. Logwood testified that the proposal imposes "significant limitations on both Sound Transit's and the City's duration of use of the property" and requires that "the City agree to separate compensation for the permanent use areas and for the long-term temporary use areas at this early stage before all design decisions defining those areas have been made." . . . Mr. Logwood further testified that there are "no guarantees that the City will need the temporary use area for only ten years, and in fact, the possibility remains that the duration of temporary use could be much longer." . . . Pine Forest's proposal would also require the City Council to amend its budget for the Bel-Red Transportation Improvement Projects.
> 11.    The City has also reasonably considered the relative cost of a complete take as compared to a temporary construction easement over any potential remainder of the Property that is not subject to a permanent use following construction of the East Link project and Bel-Red Transportation Improvement projects. In addition to the costs of acquiring the Property, the City also has considered that transaction costs associated with taking only a temporary interest in a portion of the Property and in coordinating the design and development of the City's projects with Pine Forest's proposed plans to develop a portion of the

21

Property. Although these costs are not precisely quantifiable, the City reasonably determined that it would be considerably more cost effective to acquire the Property in fee simple than to agree to Pine Forest's proposal.

The record shows Sound Transit and the City engaged in extensive discussions with Pine Forest about the proposal. Logwood testified:

> I have been in numerous meetings with City and Sound Transit Staff and other Pine Forest representatives over the last year. These meetings have always addressed the mutual objectives of the City, Sound Transit and Pine Forest to coordinate all the projects described above. Our meetings have included discussions and planning to facilitate, and reduce the cost, of these interrelated public and private projects. For these meetings and during these meetings, we reviewed hundreds of pages of City, Sound Transit and Pine Forest documents, drawings and plans.

The record shows there were a number of reasons the City decided to acquire the property in fee, including the difficulties and risk involved in trying to coordinate the East Link Project and the road improvement project with Pine Forest, and limitations on use of the property. Logwood testified, in pertinent part:

> Pine Forest has proposed that the City and Sound Transit further complicate two extremely complex public infrastructure projects in order to accommodate its interest in constructing a private development project. Contrary to Mr. Burnstead's and Mr. Wickens' representations, every proposal that Pine Forest has made to date regarding how the City and Sound Transit could coordinate their projects with Pine Forest's . . . plans has included significant limitations on Sound Transit's and the City's abilities to use the Property for these public projects. For example, the October 16, 2013, proposal from Mr. Wickens includes provisions imposing significant limitations on both Sound Transit's and the City's duration of use of the property. See Wickens Declaration, Ex. 7 at 2 (stating that temporary use term would expire "[n]o later than 2 years prior to completion of the 120th Avenue Sound Transit Station," with significant penalties for holdover occupancy); see also id., Ex. 8 (requiring a written agreement that Sound Transit vacate the Property following completion of heavy civil construction and that the City vacate the Property following completion of the NE 15th Street Project). Moreover, Pine Forest's proposals require that the City agree to separate compensation for the permanent use areas and for the long-term temporary use areas at this early stage before all design decisions defining those areas have been

22

made. See id., Ex. 7 (requesting separate compensation for the "Right of Way Area Purchase" and a temporary ground lease).

Substantial evidence also supports the finding that the City considered the relative cost of a fee acquisition as compared to a temporary ground lease or construction easement. Logwood testified that "what Pine Forest describes as 'savings' is actually just the purchase of a smaller amount of property at the same per square foot price, plus additional costs associated with a ground lease."[11] Logwood states the October 16 proposal to enter into a temporary ground lease could "increase[ ] costs associated with meeting project schedule milestones and commitments."

We hold the record supports the conclusion that the City met its burden of establishing the necessity to condemn a fee interest in the property for construction staging for the East Link Project and the road improvement project, and that Pine Forest did not establish actual or constructive fraud.

Motion to Continue

In the alternative, Pine Forest seeks remand to engage in discovery. Pine Forest asserts the court erred in denying its request to conduct discovery.

A court has broad discretion to grant or deny a continuance. Doyle v. Lee, 166 Wn. App. 397, 403-04, 272 P.3d 256 (2012). We review denial of a continuance request for a manifest abuse of discretion. Doyle, 166 Wn. App. at 403-04. A continuance to conduct discovery must be supported by a showing of due diligence. Bramall v. Wales, 29 Wn. App. 390, 393, 628 P.2d 511 (1981).

---

[11] The proposal dated February 18, 2014 is also expressly subject to "the parties agreeing on a timetable that provides flexibility for the City, and provides certainty that the property will be returned to Pine Forest."

The court granted two joint motions to reschedule the deadline to set a public use and necessity hearing. For the first time in the opposition to the motion to determine public use and necessity, Pine Forest mentions in a footnote that it "will propound written discovery." The footnote states, in pertinent part:

> After completing this Opposition brief, Pine Forest will propound written discovery into the City's deliberations and financial analysis leading to its arbitrary and capricious determination to take the entire Pine Forest Property, its basis for believing the MOU provides it with authority to condemn property for Sound Transit and depositions of those with knowledge of the City's deliberations and analysis of these issues.

The City opposed delaying the determination of public use and necessity to conduct discovery. The City argued that "Pine Forest never raised the issue of discovery previously or made any effort to conduct discovery in the many months this case has been pending."

The court denied the request for discovery. The court found that despite two previous continuances, "Pine Forest failed to raise the issue of discovery or make any effort to conduct any discovery prior to filing its Opposition to the Motion." The court also found that Pine Forest did not identify any evidence that would be obtained through discovery that would show the determination of public use and necessity was the result of constructive fraud. The court concluded Pine Forest did not act with due diligence or show good cause for a continuance, and "[f]urther delay of the Court's resolution of the City's Motion to allow Pine Forest to conduct discovery is therefore unwarranted." The record supports the court's decision to deny Pine Forest's request to engage in discovery.

We affirm the findings of fact, conclusions of law, and order determining public use and necessity.

Schindler, J.

WE CONCUR:

Verellen, A.C.J.

Dwyer, J.

2014 DEC 22 AM 10: 22
COURT OF APPEALS DIV I
STATE OF WASHINGTON