# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MICHAEL S. OTA and CONNIE OTA, a married couple,<br><br>                Appellants,<br><br>      v.<br><br>RICHARD M. WAKAZURU and KENNETH WAKAZURU,<br><br>                Respondents. | No. 82840-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — This matter comes before us under discretionary review after the trial court found appellants' counsel engaged in bad faith by attempting to influence a witness with a financial incentive prior to his deposition with the respondents. Though substantial evidence supports the trial court's finding of bad faith as to the counsel who engaged in the relevant acts, the trial court imposed the drastic sanction of disqualifying all three of appellants' counsel without a record of having considered lesser sanctions. Accordingly, we reverse the order disqualifying all three attorneys and remand for the trial court to consider possible lesser sanctions as to the counsel the trial court found acted in bad faith.

Citations and pin cites are based on the Westlaw online version of the cited material

FACTS

In March 2020, Michael S. Ota (Stacey)[1] and Connie Ota (Connie), a married couple (collectively the Otas), filed a complaint[2] against Richard Wakazuru and Kenneth Wakazuru (collectively the Wakazurus). The Otas' attorneys were Ralph Palumbo, Lynn Engel, and Joshua Krebs. At issue in the underlying case is whether Stacey and the Wakazurus had entered into a business partnership to develop real property into an RV dealership with Stacey receiving 80 percent interest in the business and the Wakazurus receiving 20 percent.

According to the Otas, in 2006, Stacey, his father Michael G. Ota (Michael), and the Wakazurus discussed potentially developing real property in Sumner, Washington into an RV dealership. The Wakazurus already owned an RV business. The property was owned by Michael and his ex-wife. The Wakazurus loaned $1 million to Michael and Stacey who signed a promissory note so that Michael could purchase his ex-wife's interest in the property and possess the full title.

The Otas claim that the Wakazurus gave the loan in exchange for 20 percent interest in a partnership between them and Stacey and Michael to work together to develop the property as an RV dealership and share in any profits

---

[1] We refer to the parties by their first or middle names for clarity because some parties share the same first and last names.
[2] The complaint alleges breach of agreement, breach of fiduciary duty, breach of good faith and fair dealing, promissory estoppel, and unjust enrichment.

derived therefrom. Stacey claims at that time he held approximately 82 percent of the remaining 80 percent interest.

In 2008, Michael, who held title to the property, executed a deed to Generation V, LLC (Gen V). In June 2012, Stacey and Michael entered into a forbearance agreement acknowledging they were in default on the promissory note and agreeing to provide a first lien deed of trust on the property as security and delaying collection on the note to end of August. In September, Michael executed a quitclaim deed to R & K West Valley Highway Investments LLC[3] in lieu of foreclosure and believed he was giving up any interest he had in the property. Michael moved to Arizona and did not speak with Stacey or Connie for about a decade. The two admittedly have been estranged. Gen V[4] dissolved in 2012.

The Otas claim Stacey in coordination with the Wakazurus had convinced Michael to convey the property to avoid exposing it to Michael's financial obligations and destroy the partnership's development plans. The Otas claim that after this transaction, Michael was "no longer participating in the Partnership," leaving Stacey with all 80 percent interest in any profits derived from the property and the Wakazurus holding the remaining 20 percent. The Otas claim they continued day-to-day maintenance of the property as well as significant issues relating to regulatory and wetlands issues.

---

[3] The Wakazurus assigned their interest in the property to R & K West Valley Highway Investments, LLC.

[4] Appellants concede they are not able to locate an executed copy of the Gen V Operating Agreement. Only an unsigned, undated draft operating agreement is in the record.

The Wakazurus, who deny ever agreeing to be in a business partnership with Stacey, sold the property in September 2017 for about $6.5 million and paid Stacey a total of $125,000 for "his efforts on the Property, and in recognition of the longstanding family relationships of certain of the parties." The Otas filed their lawsuit in March 2020.

On March 25, 2021, the Wakazurus served Michael with a subpoena duces tecum for his deposition and the production of documents. They scheduled his deposition for April 9, 2021. Following the subpoena, Connie called Michael prior to his deposition, but he did not answer. On March 26, Connie left the following voicemail:

> Hey, [Michael], it's Connie again. Just give me a call and see if I can get in touch with you this afternoon. I left Lori a message as well. I'm calling in regards to a matter in one of the parcels in Sumner that we believe you and all of us still have ownership in. So we thought that it would be wise to discuss with you and Lori. So if you could give us a call back that would be great. And it's Connie calling in regards to the parcel of land in Sumner that we believe you guys have an ownership interest in as well.

Prior to the subpoena, Connie and Stacey had never indicated to Michael that they believed he still had an ownership interest in the Sumner property.

On March 27, the Otas' children flew to Arizona to see their grandfather, Michael, and his wife Lori Ota (Lori) and urged Michael to talk to the Otas' attorney, Palumbo. Michael had not seen his grandchildren in over 10 years. According to Michael's grandson, Susumu Ota (Susumu), Michael agreed that the Otas' attorneys could call Michael. Michael's recollection differed. He said his grandchildren flew to Arizona to see him unannounced and wanted Michael to talk to Palumbo. However, according to Michael, "[W]e just said we didn't want

4

to get involved. Bridges have been burned and I actually never want to speak to my son again. That's how contentious everything was." But Michael also testified that he told his grandsons he would "think about" talking to Palumbo.

After the visit, Michael's grandchildren continued to call and leave voicemails for him requesting that he discuss the lawsuit with Palumbo.

On April 1, Susumu exchanged text messages with Lori, Michael's wife, who wrote, "if the attorneys want to call that's fine" and that Michael "is willing to hear from the attorneys. And we can go from there."[5] Palumbo called Michael and left a voicemail identifying himself as the Otas' attorney and that he wanted to talk to Michael. This was the first in about four voicemails Palumbo left for Michael.

On April 6, three days before Michael's deposition, Palumbo left Michael a voicemail that said the following in relevant part:

> I can tell you that Stacey and Connie have told us from the very beginning that if we can win this case, they feel an obligation to share some of the settlement or judgment with you along the lines of the – the split in the Gen V, LLC. I have no idea what happened between you and your son and I'm sure there's nothing I can do to repair it, but if you would be willing to talk with me, I would really appreciate it. . . .
> And then the – my partner who's been working on all this, Lynn Engel, is intimately involved and she knows a lot of the details and we would – we would really appreciate the opportunity to talk with you and I can assure you that given the fact that your son and – and his wife have said from the beginning they feel an obligation to share proceeds with you, I'm happy to talk with you about that and pin them down on that – on that commitment because my view of this is that the Wakazurus screwed the Ota family. They screwed you, they screwed Stacey, they screwed Dan – Connie,

---

[5] Screenshots of the text messages was submitted as exhibits to Susumu's declaration in support of the Otas' opposition to the motion for sanctions and was considered by the trial court.

they screwed Dan, and they absolutely should not be permitted to get away with what they – what they did and we – we've been looking at how much money your family should have received and we think it's in the 3 to $5 million range, we're still working on that.

But there's no question in my mind that they made a deal with all of you to have a partnership in which you would have – your family would have 80 percent, they would have 20 percent. They made payments on the property, which would be like capital contributions, so their percentage probably is a bit larger than 20 percent and we're still working on figuring out how much money your family put into it and how much money they did.

I'm absolutely confident that when you were convinced to voluntarily transfer the property to the Otas – or to the Wakazurus, they had made a commitment that they would hold the property and honor your family's share in the – in the property, which they didn't do. The closest we can tell the property at that point in time was worth about $5 million.

The debt on the promissory note, which was never a promissory note, was a million seven. So even if that was a legitimate promissory note, there was no way under any kind of legal proceeding that they – that they could have recovered more than 1.7 million, and instead, your family voluntarily gave them property worth $5 million and it – without your cooperation and – and Stacey and Connie encouraging you to do this, they never would have gotten the property. And even if you had to pay the million seven debt, you would have been a hell of a lot better off doing that and keeping a piece of property that was worth at least $5 million and I think probably more.

So that's a very, you know, short view, contrary to what – what they claim. Gen V, LLC was formed, it filed tax returns, you signed a deed transferring the property to Gen V, LLC, which you would not have done but for the promises that the Wakazurus were making to you, he and Connie.

The next day, two days before Michael's deposition, Lori received text messages from Susumu, and Michael received multiple voicemails from Palumbo.[6] Susumu followed up with a text message to Lori trying to schedule a conference call with the attorneys, but Lori wrote, "I'm really sorry but there is

---

[6] It is not apparent from the record the chronological order of the text messages as compared to the voicemails from Palumbo on April 7, 2021.

nothing I can do. What your family did to him is just unforgivable and that's a fact we have accepted to live with" and that there was nothing else she could do at that point. That same day, Palumbo called Michael and left a voicemail stating, "I think that we can work out something that's to your benefit. I know this is a difficult relationship you have with your son and Connie, but we are very – very willing to try to collect money on your – on your behalf as well as [the Otas']." Palumbo followed up the same day with another voicemail telling Michael that his grandsons were thinking about again flying down the next day to talk before the deposition. He stated, ". . . I just wanted to let you know that they're thinking about it so you could call them and say not to bother, but it'd really be I think helpful, certainly helpful for me and I think helpful for you and Lori if we talked before Friday."

Michael had Lori call Palumbo. Lori was very angry and told Palumbo to stop calling and they did not want to talk to them, and she told him that they did not want the grandkids to fly down again.

Michael testified at his deposition, which was held April 9, that he understood Palumbo's voicemails to be "shady" and a "pay for play" scheme, i.e., to constitute a bribe. He also testified that, although the voicemails do not mention the specific desired content of his testimony, he believed the voicemails were intended to convey to him the talking points the Otas and their attorneys wanted him to testify to, and if he did, he would be financially rewarded.

On April 16, the Wakazurus filed a motion for sanctions and provided a transcription of Michael's deposition, which included the transcription of

Palumbo's voicemails. They requested the trial court dismiss the Otas' complaint, disqualify the Otas' counsel, and other sanctions the court deemed appropriate. The Otas opposed the motion, contending that the Wakazurus had "not submitted any evidence that Plaintiffs intended to influence Michael G.'s testimony or made any suggestion or request about the content of Michael G.'s testimony." All parties requested oral argument. The court did not grant the requests for oral argument and entered its ruling based on the pleadings.

On April 30, the court entered its findings of facts, conclusions of law, and order on defendants' motion for sanctions. The court found that the voicemails appeared to show Palumbo communicated the intent to share proceeds of this lawsuit with Michael if the Otas prevailed, and that Palumbo assured Michael that he would "pin" the Otas on such a commitment. The court also made a finding of bad faith:

> Here, serious and apparently factually based allegations are made that plaintiffs' counsel attempted to influence the judicial process by inducing [Michael] to testify favorably for plaintiffs and was told of a potential share of any settlement or judgment. The amount mentioned could be viewed as a substantial financial incentive. The Court also notes the direct contacts by plaintiff [Connie] and [Michael]'s grandchildren to persuade [Michael] to speak with Mr. Palumbo. The Court believes that a showing of bad faith has been made.

The court ordered that the Otas' counsel be disqualified from the case and ordered defense counsel to make a referral to the WSBA disciplinary counsel and to police/prosecutors for further investigation. The court stayed the lawsuit stating it would review the status of these referrals and any ensuing

8

investigations at the end of September 2021.  At the time the court entered its order, the trial had been scheduled for June 7.

The Otas and Palumbo filed a motion for reconsideration and clarification. In addition to Palumbo denying he acted improperly, he also asked the court to clarify whether it was disqualifying only him based on the court's language in the order using "counsel" in the singular, or whether the court was disqualifying co-counsel Engel and Krebs as well.  Wakazuru responded to the motion asking the court to disqualify all three attorneys because Krebs' declaration in support of the motion for reconsideration stated that he listened to the voicemails Palumbo left for Michael and they were "consistent" with what the three attorneys agreed should have been communicated.  The trial court denied the motion for reconsideration and clarified that its previous sanctions order disqualified plaintiffs' counsel, which encompassed Palumbo, Engel, and Krebs.

The Otas and each of the disqualified attorneys filed motions for discretionary review.  This court consolidated the motions.  A commissioner of this court granted discretionary review.

DISCUSSION

Standard of Review

The parties agree that the trial court's ultimate decision to impose the sanction of disqualification is reviewed for abuse of discretion.  Hedger v. Groeschell, 199 Wn. App. 8, 14, 397 P.3d 154 (2017).  "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable

grounds or untenable reasons." In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

However, the parties disagree over the standard applied to reviewing the underlying factual basis of the trial court's decision to sanction. The appellants contend that this court's review is de novo because the trial court based its decision solely on the written record, which the appellate court is as well positioned to review and render a decision on. The respondents contend that the trial court's findings should be reviewed for substantial evidence. Under the circumstances of this case, we agree with the respondents. "We review a trial court's challenged findings of fact for substantial evidence." Andren v. Dake, 14 Wn. App. 2d 296, 306, 472 P.3d 1013 (2020).

We recognize that where "the record at trial consists entirely of written documents and the trial court therefore was not required to 'assess the credibility or competency of witnesses, and to weigh the evidence, nor reconcile conflicting evidence,' the appellate court reviews de novo." Dolan v. King County, 172 Wn. 2d 299, 310, 258 P.3d 20 (2011) (internal quotation marks omitted) (quoting Progressive Animal Welfare Soc'y v. Univ. of Wash., 125 Wn.2d 243, 252, 884 P.2d 592 (1994); see also Robinson v. Am. Legion Dep't of Wash., Inc., 11 Wn. App. 2d 274, 286 n.4, 452 P.3d 1254 (2019).

However, even when the superior court judge rests its ruling entirely on written submissions, the substantial evidence standard of review is appropriate when the matter turns on credibility determinations and a factual finding of bad faith. In re Marriage of Rideout, 150 Wn. 2d 337, 351, 77 P.3d 1174 (2003).

This court has applied such a standard even in a non-family case scenario. Robinson, 11 Wn. App. 2d at 286 (applying substantial evidence review to a written record while recognizing that whether a person acted in good faith is an inherently factual issue).

"'When jurisdiction is . . . conferred on a court or judicial officer all the means to carry it into effect are also given.'" State v. S.H., 102 Wn. App. 468, 473, 8 P.3d 1058 (2000) (second alteration in original) (quoting RCW 2.28.150). In turn, in such situations, "'[d]ecisions either denying or granting sanctions . . . are *generally* reviewed for abuse of discretion.'" Id. (emphasis added) (second alteration in original) (quoting Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 338, 858 P.2d 1054 (1993)). We cannot envision a scenario where an appellate court is in a better position than a trial court to consider in the first instance the factual scenario and circumstances underlying a decision to sanction a party's counsel. In the instant case, the court's finding of bad faith is inherently a factual finding and, by rejecting appellant's general denial of attempting to influence Michael, the trial court made a credibility determination.

Finally, "[t]here is a presumption in favor of the trial court's findings, and the party claiming error has the burden of showing that a finding of fact is not supported by substantial evidence." Andren, 14 Wn. App. 2d at 306 (quoting State v. Merrill, 183 Wn. App. 749, 755, 335 P.3d 444 (2014)). Substantial evidence is defined as a "quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003) (citing Wenatchee Sportsmen Ass'n v.

Chelan County, 141 Wn.2d 169, 176, 4 P.3d 123 (2000)). "If the standard is

satisfied, a reviewing court will not substitute its judgment for that of the trial court

even though it might have resolved a factual dispute differently." Sunnyside

Valley Irrig., 149 Wn.2d at 879-80. "The label applied to a finding or conclusion

is not determinative; we 'will treat it for what it really is.'" Nguyen v. City of

Seattle, 179 Wn. App. 155, 163, 317 P.3d 518 (2014) (quoting Para–Med.

Leasing, Inc. v. Hangen, 48 Wn. App. 389, 397, 739 P.2d 717 (1987)).

Challenged Findings of Fact

The appellants challenge multiple findings of fact. First, they challenge

finding of fact 4, which provides the following:

> [Michael] is plaintiff [Stacey's] father, and plaintiff [Connie's] father
> in law. Prior to [Michael's] deposition being noted, the parties seem
> to agree that plaintiffs had not made any efforts to contact [Michael]
> for many years. [Michael] apparently knew nothing about this
> lawsuit, despite the fact that plaintiffs alleged he was one of four
> partners to their alleged partnership, until defense counsel called
> him in March 2021 following the plaintiffs' depositions. Prior to his
> deposition being noted by defendants for April 7, 2021,[7] the record
> indicates that plaintiffs had not communicated to [Michael] an intent
> to "share proceeds" of this lawsuit, and the Court has some
> difficulty understanding [Connie's] voicemail to [Michael] shortly
> before his scheduled deposition that the plaintiffs believed [Michael]
> owned an interest in real property involved in this lawsuit given the
> allegations in Plaintiffs' [sic] complaint.

Specifically, they contend that the court erred in finding that the court had "'some

difficulty understanding' why the Otas believed [Michael] has an interest in real

property involved in the underlying lawsuit." Appellants question the court's

determination that Connie's voicemail was suspect despite it being consistent

_____

[7] The deposition was actually held on April 9, 2021.

with earlier depositions given by Stacey and Connie that Michael was part of the partnership and that agreeing to the forbearance agreement was a way to protect everyone's interest, including Michael's. Whether the Otas' have consistently maintained that the reason Stacey convinced his father to enter into such an agreement in order to protect Michael's interest does not change the fact that 1) the Otas claimed in their complaint that after the forbearance transaction, Michael was "no longer participating in the Partnership," leaving Stacey with all 80 percent interest in any profits derived from the property and the Wakazurus holding the remaining 20 percent, and 2) it was not until the day after the Wakazurus served a subpoena on Michael that Connie communicated to Michael that she and Stacey believed Michael "still" had ownership in one of the parcels in Sumner.

Insofar as the court's comment as to its own observation may constitute a finding of fact, it is supported by the record as to why the court had "some difficulty understanding" Connie's voicemail given the Otas' complaint. It is arguable whether the court's difficulty in understanding was an expression of skepticism or a genuine question of confusion. We note that while any lack of clarity may have been resolved by a holding a hearing, this court will not substitute its judgment for that of the trial court in this situation. Sunnyside, 149 Wn.2d at 879-80.

Appellants next challenge finding of fact 7, arguing the court erred in finding that "'actions by plaintiffs' counsel seriously concern the Court and need to be referred to appropriate authorities." While we note it is very unusual to

13

include such directives in a court order imposing sanctions, particularly when a trial court has not conducted a hearing of any kind, this is not a finding of fact and the appellants do not challenge the court's authority to request defense counsel to make referrals to WSBA or police/ prosecutors for further investigation. We need not address it any further.

Appellants also challenge finding of fact 8, contending that the "court erred in finding that it need only consider 'bad faith' to disqualify the Otas' entire legal team and that bad faith requires nothing more than 'inappropriate and improper conduct.'" However, finding of fact 8 provides the following:

> The Court has the inherent authority to "enforce order in the proceedings before it" and to "provide for the orderly conduct of proceedings before it." State v. S.H., 102 Wn. App. 468, 473, 8 P.3d 1058 (2000) (citing RCW 2.28.010(2)-(3)). The Court may, under its inherent authority to control litigation, fashion and impose appropriate sanctions. In re Firestorm, 129 Wn.2d 130, 139, 916 P.2d 411 (1996). In articulating sanctions under its inherent authority, this Court must make a finding of bad faith. Hedger v. Groeschell, 199 Wn. App. 8, 14, 397 P.3d 154 (2017) (citing S.H., 102 Wn. App. at 475). A party may demonstrate bad faith by inappropriate and improper conduct. Andren v. Dake, 14 Wn. App 2d 296, 321, 472 P.3d 1013 (2020) (citing S.H., 102 Wn. App. at 475).

The court merely provided case law to support its findings; it itself is not a finding of fact.

Appellants next challenge finding of fact 10, which states, "The Court has the authority and a duty to see to the ethical conduct of lawyers in proceedings before it and, upon proper grounds, can disqualify an attorney. Hahn v. Boeing

14

Co., 95 Wn.2d 28, 34, 621 P.2d 1263 (1980). Proper grounds are present here.

This is an accurate statement of the law. We address below the appellants

challenge of other findings related to bad faith.

Bad Faith

Appellants contend that the trial court applied the wrong legal standard of

bad faith and substantial evidence does not support the court's finding of bad

faith. We disagree that the trial court imposed the incorrect legal principles in this

situation and disagree that there are no sufficient facts to justify the trial court's

finding of bad faith.

The trial court cited Andren, which explicitly stated, "[A] trial court's

inherent authority to sanction litigation conduct is properly invoked upon a finding

of bad faith." Andren, 14 Wn. App. 2d at 321 (citing S.H., 102 Wn. App. at 475).

Further, it added,

> "The court's inherent power to sanction is "governed not by rule or
> statute but by the control necessarily vested in courts to manage
> their own affairs so as to achieve the orderly and expeditious
> disposition of cases." Sanctions may be appropriate if an act
> affects "the integrity of the court and, [if] left unchecked, would
> encourage future abuses."

Andren, 14 Wn. App. 2d at 321 (alteration in original) (internal quotation marks

omitted) (quoting S.H., 102 Wn. App. at 475). The Otas fail to distinguish

Andren.

Appellants also cite to Biggs v. Vail, 124 Wn.2d 193, 197, 876 P.2d 448

(1994); Skimming v. Boxer, 119 Wn. App. 748, 754, 82 P.3d 707 (2004); and

MacDonald v. Korum Ford, 80 Wn. App. 877, 884, 912 P.2d 1052 (1996) to

argue that the trial court did not consider the proper objective standard, and that

15

it only ruled that bad faith means nothing more than "inappropriate and improper conduct." In the context of considering CR 11 sanctions, those cases discuss that courts should employ an objective standard in evaluating an attorney's conduct.

Contrary to the Otas' argument, the record establishes that the trial court did not base its ruling only on Michael's subjective belief rather than an objective inquiry. While the trial court mentioned Michael's subjective understanding of the voicemails, the court expressly enumerated and considered the whole record in making its determination, including objective evidence—the statements contained in Palumbo's voicemails and the text messages.

The next inquiry is whether substantial evidence supports the finding that Palumbo's statements to Michael established bad faith.

Appellants assert that Palumbo's calls were consistent with standard practice. They argue it was reasonable for them to believe that Michael had an interest in Gen V and thus an interest in the lawsuit, that the Otas intended to honor that interest if they prevailed, and that Michael agreed to receive their phone call.

Appellants appear to believe that the determination of whether the conduct constituted bad faith turns on whether the Otas reasonably believed that Michael had an interest in the lawsuit. The Otas misconstrue the trial court's concern. The concern is not whether counsel had a basis to support its legal theory or the decision to reach out to Michael prior to his deposition. The concern expressed

16

by the trial court is what was conveyed to Michael, how it was conveyed, and when it was conveyed.

Appellants contend that Palumbo "never even mentioned [Michael's] potential testimony, much less suggested that he should testify in any certain way" or "suggest that [Michael's] interest in any lawsuit proceeds depended on his deposition testimony, but simply stated the Otas' intent to honor his interest." Appellants challenge finding of fact 9, which provides:

> Here, serious and apparently factually based allegations are made that plaintiffs' counsel attempted to influence the judicial process by inducing [Michael] to testify favorably for plaintiffs and was told of a potential share of any settlement or judgment. The amount mentioned could be viewed as a substantial financial incentive. The Court also notes the direct contacts by plaintiff [Connie] and [Michael's] grandchildren to persuade [Michael] to speak with [Palumbo]. The Court believes that a showing of bad faith has been made.

Specifically, appellants challenge the court's language, "The amount mentioned could be viewed as a substantial financial incentive."

The trial court's presentation of Palumbo's statements must be viewed in context and not in isolation. The trial court noted the multiple statements of concern. Palumbo told Michael he thinks the lawsuit could be worth around 3 to 5 million dollars. In the messages left for Michael, the court noted the following statements by Palumbo:

> (1) "I think that we can work out something that's to your benefit"; (2) "we are very – very willing to try to collect money on your – on your behalf as well as theirs"; (3) and "it'd be really be helpful for me and I think helpful for you and Lori [Michael's wife] if we talked before Friday [the date of Michael's deposition]."

Additionally, Palumbo said, "I can tell you that Stacey and Connie have told us from the very beginning that if we can win this case, they feel an obligation to share some of the settlement or judgment with you. . ." This statement communicated to Michael that his chance of receiving money is dependent on the Otas winning their case against the Wakazurus.

As the trial court noted, these statements were made in the context of Palumbo sharing with Michael the Otas' theory of why they should win the case that involved how Palumbo viewed Michael's own interactions with the Wakazurus. Palumbo said, 1) "[The Wakazurus] made a deal with all of you to have a partnership in which you would have – your family would have 80 percent, they would have 20 percent", 2) "when you were convinced to voluntarily transfer the property to the Otas – or to the Wakazurus, they had made a commitment that they would hold the property and honor your family's share in the – in the property, which they didn't do", and 3) "Gen V, LLC was formed, it filed tax returns, you signed a deed transferring the property to Gen V, LLC, which you would not have done but for the promises that the Wakazurus were making to you, he and Connie."

The trial court further alluded to how unexpected this contact was. Michael had no recollection of ever talking to Stacey and the Wakazurus to develop the property as an RV dealership. Michael denied ever discussing verbally or in writing a profit-sharing arrangement. The trial court also emphasized the peculiar timing of this contact. Appellants failed to provide any

18

explanation as to why it was urgent to let Michael know before the deposition that if the Otas obtained a judgment or settlement, Michael would get a share.

In context, substantial evidence supports the court's finding that "[t]he amount mentioned could be viewed as a substantial financial incentive" for Michael to testify at the deposition consistent with Palumbo's version of events.

Substantial evidence supports the trial court's finding of bad faith as to Palumbo.

<u>Disqualification</u>

Appellants next contend that the trial court erred by not considering lesser sanctions before disqualifying all three counsel. We agree.

A trial court has "the authority and duty to see to the ethical conduct of attorneys in proceedings before it" and, on proper grounds, has the power to disqualify counsel. <u>Hahn</u>, 95 Wn.2d at 34. "'[A] trial court's inherent authority to sanction litigation conduct is properly invoked upon a finding of bad faith.'" <u>Andren</u>, 14 Wn. App. 2d at 321 (quoting <u>S.H.</u>, 102 Wn. App. at 475). However, "[d]isqualification of counsel is a drastic remedy that exacts a harsh penalty from the parties as well as punishing counsel; therefore, it should be imposed only when absolutely necessary." <u>Matter of Firestorm 1991</u>, 129 Wn.2d 130, 140, 916 P.2d 411 (1996) (citing <u>MMR/Wallace Power & Indus., Inc. v. Thames Assocs.</u>, 764 F. Supp. 712, 718 (D.Conn.1991)).

In <u>Firestorm</u>, our Supreme Court concluded that the trial court erred in imposing the sanction of disqualification under CR 26 when an attorney engaged in ex parte contact with an opposing party's expert witness. 129 Wn.2d at 140. It

reasoned that the facts did not support disqualification because the expert did not have access to privileged information—he was not an integral employee of the company involved in litigation, and he was not privy to litigation strategy. Id. at 141.

The Firestorm court applied a Fisons analysis. Id. at 142 (citing Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d at 355-56). It explained that the Fisons court set forth principles trial courts should follow in fashioning appropriate sanctions under CR 26:

> First, *the least severe sanction that will be adequate to serve the purpose of the particular sanction should be imposed.* The sanction must not be so minimal, however, that it undermines the purpose of discovery. The sanction should insure that the wrongdoer does not profit from the wrong. The wrongdoer's lack of intent to violate the rules and the other party's failure to mitigate may be considered by the trial court in fashioning sanctions.
>
> The purposes of sanctions orders are to deter, to punish, to compensate and to educate.

Firestorm, 129 Wn. at 142 (emphasis added) (citing Fisons, 122 Wn.2d at 355-56)). The court noted that discovery sanctions in general are meant to prevent attorney misconduct, and to the extent possible, individual parties should not be penalized for their attorneys' misconduct in the discovery process. Id. at 143. The Firestorm court held that the trial court failed to follow the guidelines set forth by Fisons, and the record did not reveal whether the court considered any other sanctions before disqualifying counsel—it noted that the court made no findings either way on this issue. Id. But the Supreme Court determined that after considering sanctions in light of the facts of that case, disqualification was not the least severe sanction adequate to serve the purpose of sanctions in that case.

20

Id. at 145. It accordingly reversed the trial court's order of disqualification and ordered reinstatement of counsel. Id. It ordered that on remand, the trial court must fashion an appropriate remedy consistent with the principles and guidelines set forth in the opinion. Id.

This court followed suit in Foss, adopting the principles of Firestorm and Fisons. Foss Mar. Co. v. Brandewiede, 190 Wn. App. 186, 189, 359 P.3d 905 (2015). In Foss, the trial court disqualified counsel based on an attorney's access to privileged information through discovery under CR 26(b). Foss, 190 Wn. App. at 189. We determined the trial court failed to consider on the record the principles and guidelines set forth in Firestorm and Fisons regarding (1) prejudice, (2) counsel's fault, (3) counsel's knowledge of privileged information, and (4) possible lesser sanctions. Id. In regard to the fourth factor, we noted that the "harsh sanction of disqualification of counsel should be imposed only if it is the least severe sanction adequate to address misconduct in the form of improper access to privileged information." Id. at 197. We further explained that "[n]o one factor predominates or has greater importance than others" and "[a]t a minimum, the record must permit us to evaluate the trial court's consideration of those four factors." Id.

Although the context in which the court disqualified counsel in Firestorm and Foss were different than the basis for disqualification in the instant case, we see no reason why the underlying principles and guidelines that relate to the severity of the sanction—disqualification of counsel—would not similarly apply

here.[8]  While the instant case does not involve a discovery violation under CR 26 and does not involve concerns about obtaining privileged information, it does concern the integrity of the court and, if left unchecked, would encourage future abuses.

Because we recognize that disqualification of counsel should be imposed only when absolutely necessary as it is a drastic remedy that exacts a harsh penalty from the parties as well as punishing counsel, when a trial court disqualifies counsel it must consider lesser sanctions in order to determine that disqualification is absolutely necessary.  Appellants argue that the sanction of disqualification was far too severe because it forced the Otas to hire an entirely new legal team and recreate years of work at considerable time and expense weeks before trial.[9]

Following the applicable principles and guidelines from Fisons and Firestorm, the court should impose the least severe sanction that would be adequate to serve the purpose of the particular sanction.  The sanction should ensure that the wrongdoer does not profit from the wrong.  The wrongdoer's lack

---

[8] The Otas also cite to Burnet v. Spokane Ambulance, 131 Wn.2d 484, 933 P.2d 1036 (1997) (fashioning a three-part test based on Fisons that the court must consider on the record before imposing severe discovery sanctions under CR 37(b)).  Under Burnet, before a trial court imposes a severe sanction, it should consider on the record (1) whether a lesser sanction would probably suffice, (2) whether the violation was willful of deliberate, and (3) whether the violation substantially prejudice the opposing party.  Id. The Burnet analysis applies when severe sanctions are imposed for discovery violations and when a trial court excludes untimely evidence submitted in response to summary judgment motions.  Keck v. Collins, 184 Wn.2d 358, 369, 357 P.3d 1080 (2015).

[9] The trial court stayed the matter until at least September 30, 2021.  The case remains stayed pending this appeal.

of intent to violate the rules and the other party's failure to mitigate may be considered by the trial court in fashioning sanctions.

Though the court entered written findings and conclusions identifying specific grounds it relied on as it related to Palumbo's actions, it made no mention of whether it considered lesser sanctions. Because there was no oral argument below, the record does not permit us to otherwise evaluate whether the trial court considered lesser sanctions. See Foss, 190 Wn. App. at 197 (holding that at a minimum, the record must permit us to evaluate the trial court's consideration of the factors outlined in Firestorm and Fisons).

Additionally, we note that the court's findings focused entirely on Palumbo's actions alone. It was only after the appellants submitted a motion for reconsideration and clarification the Wakazurus argued and the trial court clarified that disqualification of counsel should also apply to Krebs and Engel based on a declaration from Krebs. In his declaration in support of opposition to the motion for sanctions, Krebs stated, "I have listened to Ralph Palumbo's voicemail messages to Michael G. I believe Ralph Palumbo's messages are consistent with what he, Lynn Engel and I agreed we should communicate." The court did not enter any findings related to Krebs or Engel in its initial findings, nor did the court make additional findings when it clarified that the disqualification of counsel included Krebs and Engel.

Krebs testified that the purpose of calling Michael "was first to explain the facts of [the Otas'] case and offer to provide him with any documents that might refresh his memory so that he could testify truthfully and accurately." However,

Palumbo's voicemails did not just generally discuss the Otas' case, or share the fact that he generally believed that Michael also had an interest in the case, or offer to provide specific documents to refresh Michael's memory. Palumbo's voicemails went much further.

The record is unclear on how Krebs' admission that Palumbo's messages were "consistent" with what the three attorneys agreed should be communicated sufficiently imputes Palumbo's conduct to Krebs and Engel. Specifically, the record is unclear on why Palumbo's statements and timing of those statements support imposing the most severe sanction of disqualifying Krebs and Engel. We reverse the order disqualifying Krebs and Engle because no findings support either acted in bad faith.

Appellants argue that, even if the voicemails were improper, the Wakazurus were not prejudiced because they did not "profit" from the alleged "wrong." Specifically, they argue there was no prejudice because the Otas did not gain an advantage from the alleged misconduct. Certainly, in certain scenarios, a trial court could consider the fact that a party benefited from bad faith conduct when determining sanctions, which would suggest that the opposite is true as well. But that does not mean that a court should not impose any sanctions. The purposes of sanctions are to deter, punish, compensate and educate. Fisons, 122 Wn.2d at 356. "[A]ttempts to influence a witness to change his testimony or to absent himself from a trial or other official proceeding, necessarily have as their purpose and it is their natural tendency to obstruct

justice. They are offenses against the very object and purpose for which courts are established." State v. Stroh, 91 Wn.2d 580-582, 588 P.2d 1182 (1979).

Appellants argue that nothing in the record supports Palumbo trying to "influence" Michael's testimony because they were simply reiterating what the Otas' presented to be true. It is true that nothing in the record suggested that prior to Michael's deposition, Palumbo knew that Michael denied ever having agreed verbally or in writing to a profit-sharing agreement with the Wakazurus. At the same time, Palumbo's voicemails suggested that he was not interested in finding out what Michael's position was, but instead suggested what it should be in order for the Otas to win their case and share their settlement or judgment with Michael.

However, despite substantial evidence supporting the finding of bad faith as to Palumbo, because the trial court did not expressly consider possible lesser sanctions, we also reverse the trial court's disqualification order as to Palumbo.

<u>Reassignment</u>

The Otas request this court reassign this matter to a different judge on remand. However, the Otas have not established prejudice sufficient to justify reassignment. To justify reassignment to a new judge, a party must "submit proof of actual or perceived bias to support an appearance of partiality claim." GMAC v. Everett Chevrolet, Inc., 179 Wn. App. 126, 154, 317 P.3d 1074 (2014). Imposing sanctions is not enough to rise to the level of bias or perceived bias. We deny the Ota's request to reassign this matter to a different judge on remand.

CONCLUSION

Substantial evidence supports a finding of bad faith only as to Palumbo. Even with that finding, we conclude the trial court's order of disqualification does not satisfy the applicable principles and guidelines of Fisons and Firestorm. We therefore reverse the trial court's order of disqualification as to all three counsel. On remand, any order of disqualification will require, at minimum, the consideration and analysis of possible lesser sanctions as to Palumbo.[10]

_Coburn, J._

WE CONCUR:

_Díaz, J._                    _Smith, A.C.J._

---

[10] Because we reverse the order of disqualification, we need not consider the Wakazurus' request for attorney fees under RAP 18.1(a).